**SCOTT WETZEL SERVICES, INC., Petitioner,**

v.

**James H. JOHNSON and Leuvenia F. Swindall–Johnson, Respondents.**

**SCOTT WETZEL SERVICES, INC., Petitioner,**

v.

**Edward TOZER and Georgia Tozer, Respondents.**

**Nos. 90SC335, 90SC336.**

Supreme Court of Colorado, En Banc.

Dec. 9, 1991.

---

Hall & Evans, C. Willing Browne, Malcolm S. Mead, Denver, for petitioner.

Worstell & Dunning, Neal K. Dunning, Denver, for respondents in both cases.

Stefan Kazmierski, Denver, for amicus curiae Colorado Defense Lawyers Ass'n.

Wilcox, Ogden & Cox, P.C., Ralph Ogden, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Justice LOHR delivered the Opinion of the Court.

The petitioner, Scott Wetzel Services, Inc. (Wetzel), seeks reversal of two court of appeals decisions, *Johnson v. Scott Wetzel Services, Inc.*, 797 P.2d 786 (Colo.App. 1990), and *Tozer v. Scott Wetzel Services, Inc.*, No. 88CA1723 (Colo.App. April 19, 1990) (unpublished). In each case, the Colorado Court of Appeals held that an independent claims adjusting company acting on behalf of a self-insured employer owes a duty of good faith to an injured employee in investigating and processing a workers' compensation claim even in the absence of contractual privity with the employee. We granted certiorari and consolidated the cases for the purposes of briefing and argument. We affirm the judgments of the court of appeals.

I.

A summary of the factual and procedural history of the two cases will facilitate an understanding of the common legal issue that we must resolve. We derive the facts principally from the record in the Johnson case, for it proceeded through a full evidentiary presentation, whereas the Tozer case was resolved on summary judgment. James H. Johnson and Edward Tozer filed workers' compensation claims with their employer, Safeway Stores, Incorporated (Safeway). The Workers' Compensation Act (the Act)[1] provides that benefits are available where, at the time of the injury, the employee is performing services "arising out of and in the course of his employment." § 8–52–102(1)(b), 3B C.R.S. (1986) (now codified at § 8–41–301(1)(b) (1991 Supp.)). The Act also requires that an employer obtain insurance or authority to act as a self-insurer to secure compensation benefits to its employees. § 8–44–101, 3B C.R.S. (1986) (now codified at § 8–44–101, 3B C.R.S. (1991 Supp.)). At the times relevant to the cases before us, Safeway was self-insured. *See* § 8–44–109, 3B C.R.S. (1986) (now codified at §§ 8–44–201 to –206, 3B C.R.S. (1991 Supp.)). Safeway engaged Wetzel, an independent claims administration service, to act as its claims adjuster. Thus, when Johnson and Tozer requested workers' compensation benefits, Safeway submitted their claims to Wetzel for processing. Johnson and Tozer subsequently filed two separate lawsuits against Safeway, Wetzel, and Home Insurance Company,[2] contending that their claims had not been properly processed.

Wetzel is a company that primarily performs claims administration work for large, self-insured clients throughout the country. As a claims adjuster for Safeway, Wetzel's duties encompassed the investigation of claims and the initial determination of whether a claim is compensable. Wetzel received the first report of the injuries from the employer, set up the files,

---

1. The Workers' Compensation Act of Colorado appears in Title 8, Articles 40–47, 3B C.R.S. (1986 & 1991 Supp.).

2. The record does not establish the relationship, if any, between Home Insurance Company and the other parties to these cases. Home Insurance Company was ultimately dismissed from both cases by stipulation.

requested medical reports, made the necessary filings with the division of labor, and then followed through by paying the medical bills and other benefits. Wetzel issued checks to the employees under an account in its own name, but the money was supplied by Safeway. In addition, Wetzel and Safeway held monthly meetings in which they discussed pending cases. According to the testimony of Mary Speed, the claims manager for Wetzel, Wetzel gave "input" as to how cases should be handled. Speed testified that Safeway resolved all controversial issues regarding claims, selected the medical providers for injured employees, and selected attorneys to represent it in cases involving contested claims. A Safeway nurse, Mary Taylor, gathered medical information on claimants such as Johnson and Tozer and provided the information to Wetzel.

### A.

Johnson worked as an order selector at a distribution center for Safeway. Johnson's job required him to lift boxes of frozen food with a total daily weight averaging about 30,000 pounds. He was assigned a quota necessitating that he lift 123 pieces for each 20 minute interval in a day. He would take boxes weighing from 5 to 100 pounds from the floor and lift them as high as 6 feet; thus, the job entailed much lifting and bending. Johnson was engaged in this work from 1974 to 1981, eight hours a day. The working environment was harsh with temperatures ranging from 8 to 20 degrees below zero.

In February 1981, Johnson suffered a groin injury while lifting two boxes of orange juice. Due to the injury, he initially missed two days of work. With Safeway's approval, Wetzel issued a check to Johnson in an appropriate amount in compensation for temporary disability. The claim file was then closed. Despite continuing pain, Johnson worked until December 1981 when the pain forced him to discontinue his work.

He reported the injury to his supervisor, and Safeway referred him to a company physician, Dr. Derebury.[3] Dr. Derebury diagnosed a "right groin strain" and indicated that it was not a work-related injury. Dr. Derebury referred Johnson to a private physician, and Johnson consulted a urologist, Dr. Pelander. After examining Johnson, Dr. Pelander wrote a letter addressed "To Whom It May Concern," which stated, "[m]y diagnosis at this time is one of bilateral epididymitis,[4] which certainly could have been exacerbated with severe physical exertion over the last several days." Johnson requested that Safeway pay temporary total disability benefits based on Dr. Pelander's letter. Wetzel contested the claim, contending that the injury did not arise out of Johnson's employment. In so doing, Mary Speed, a Wetzel claims adjuster, relied on information obtained from the Safeway nurse, the report from the Safeway company doctor, and her belief that Dr. Pelander's conclusion was equivocal. She did not conduct further investigation after receiving Dr. Pelander's letter, nor did she request an independent medical examination at that point.

On January 21, 1982, Dr. Pelander wrote a letter to Johnson's attorney, and Wetzel later received a copy. The letter stated:

> The differential diagnosis of epididymitis is multifactorial, and one of these causes is known to be reflux of sterile or unsterile urine into the vas deferens, secondary to physical straining.
>
> If indeed Mr. Johnson was performing strenuous physical labor at the time that he developed his symptoms of epididymitis, then one can conclude a cause and effect relationship in this situation.

Wetzel continued to refuse to pay benefits to Johnson. Mary Speed, the claims adjuster, interpreted this report from a noncompany doctor as relating nothing definitive. She did not investigate the claim any further; she simply reviewed Johnson's medi-

---

**3.** Under the Act, employers may designate physicians, *see* § 8–42–101(1)(a), 3B C.R.S. (1991 Supp.), subject to the department of labor's accreditation requirements, § 8–42–101(3.5)-(3.7).

**4.** Epididymitis is an inflammation of an elongated cord-like structure along the posterior border of the testis. *Dorland's Illustrated Medical Dictionary* 567 (27th ed. 1988).

cal reports and spoke with the company nurse.

In May of 1982, Johnson filed a petition to reopen his February 1981 workers' compensation case.[5] He alleged that the symptoms he experienced in December 1981 arose out of his February 18, 1981, injury. An administrative law judge (ALJ) held hearings on the petition in March and June of 1983. In the hearings, Johnson relied on a report by Dr. Grossman, an independent urologist. Dr. Grossman stated that Johnson's bilateral testicular pain, which began in an on-the-job injury in February 1981, was work-related. The ALJ ruled in January 1984 that the case should be reopened. In addition, he held that Johnson's injury was work-related and compensable, and ordered Safeway to pay Johnson $8,283.15 in temporary total disability benefits for the incapacity dating from December 1, 1981, through July 25, 1982. The ALJ reserved for future determination issues including any benefits Safeway owed to Johnson for the period of disability after July 25, 1982. Safeway appealed the ALJ's decision to the Industrial Claim Appeals Panel (Panel),[6] but subsequently paid the $8,283.15 as ordered by the ALJ and did not pursue the appeal.

In March 1984, the ALJ held a medical hearing to determine whether Safeway owed benefits to Johnson for the period after July 25, 1982. At Safeway's request, the ALJ agreed to adjourn the hearing and withhold a decision on the merits to enable Safeway to take the deposition of Dr. Grossman. Safeway did not depose Dr. Grossman until December 1984. One full year after the original hearing, in March of 1985, the ALJ issued an order requiring Safeway to pay temporary total disability benefits for various periods of time following July 25, 1982. Safeway appealed the ruling, including once again among its assertions of error that the injury was not work-related. Finally, in April 1986 the

Panel affirmed the ALJ's decision. Wetzel issued a check in May 1986 to Johnson for benefits owed for temporary total disability during various periods after July 25, 1982.

During the pendency of the appeals, Johnson received no money from Safeway or Wetzel in addition to the $8,283.15 ordered by the ALJ. Temporary total disability benefits are suspended during the pendency of an appeal on the issue of whether an injury is work-related. See § 8–43–301(12), 3B C.R.S. (1991 Supp.). Johnson suffered severe financial difficulties as a result of the delays in receiving benefits. He testified that he had problems paying even his basic living expenses. He stated,

> I borrowed money from my doctor, I borrowed through my law firm, and we put our house up about three times to a high interest broker. First time we borrowed something like $3,000, and that was good for a year. Then we keep robbing Peter to pay Paul. We go and borrow [$]8,000 to pay off the [$]3,000 plus the interest and then, last time we had to—they was getting ready to do it this time, and we borrowed like [$]15,000 to pay off the [$]8,000 .... [T]hey know we didn't have any money, so we had to go back to this high interest and put $15,000 more on our home in order to hire an attorney and pay off the other $8,000 loan which we shouldn't have had in the first place.

Johnson testified that he had to sell his van, motorcycle, and car. His savings evaporated. In addition, he had to borrow approximately $5,000 to $6,000 over a period of time from his daughter.

In July 1987, Johnson filed a lawsuit against Safeway, Wetzel, and Home Insurance Company for breach of contract and bad faith processing of Johnson's workers' compensation claim, among other things. Johnson's wife also asserted a claim for loss of consortium.[7] At the conclusion of the evidence, Wetzel moved for a directed

---

5. See § 8–53–113, 3B C.R.S. (1986) (now codified at § 8–43–303, 3B C.R.S. (1991 Supp.)).

6. See § 8–53–111, 3B C.R.S. (1986) (now codified at § 8–43–301, 3B C.R.S. (1991 Supp.)).

7. Before trial, the Johnsons entered into a stipulation with Safeway and Home Insurance Company agreeing to dismissal of both defendants with prejudice from the lawsuit. The court entered an order of dismissal based on the stipulation.

verdict. The trial court deferred ruling on the motion and submitted the case to the jury. The trial court instructed the jury on only the bad faith processing of Johnson's claim, implicitly ruling that the Johnsons had abandoned their other claims. The jury was unable to reach a verdict. The trial judge then granted Wetzel's motion for a directed verdict, holding that "in order to bring this kind of action, there must be an insurance contract between the plaintiff and the defendant, or at least the plaintiff must be a beneficiary of an insurance contract issued by the defendant." The Johnsons appealed.[8] The court of appeals held:

> The single issue on appeal is whether an independent insurance adjusting firm owes a duty of good faith to an injured claimant in investigating and processing a workmen's compensation claim independent of any contractual privity. We conclude that such a duty does exist and, therefore, reverse [the judgment of the trial court].

*Johnson v. Scott Wetzel Services, Inc.,* 797 P.2d 786, 787 (Colo.App.1990). The court of appeals remanded the case to the trial court with directions to reinstate the Johnsons' complaint. *Id.* at 787–88.

### B.

Tozer suffered a work-related injury in September 1982. Safeway admitted liability for the injury, and paid compensation for temporary total disability for various periods after September 1982. Tozer subsequently submitted a supplemental workers' compensation claim alleging additional periods of temporary total disability, and Safeway contested this claim. After a hearing, an ALJ entered an order awarding Tozer further compensation. Safeway appealed, and the Panel affirmed the ALJ's decision.

In July 1987, Tozer and his wife, represented by the same attorney representing the Johnsons, filed a lawsuit against Safeway, Wetzel, and Home Insurance Company setting forth essentially the same types of claims for relief as the Johnsons did in their complaint. Like the Johnsons, the Tozers later stipulated to dismissing Safeway and Home Insurance Company from the lawsuit. In August of 1988, the trial court granted Wetzel's motion for summary judgment. In October 1988 the trial court denied reconsideration of that ruling and explained that the ground for summary judgment was that Wetzel lacked a duty to Tozer to act in good faith in processing Tozer's workers' compensation claim. The Tozers appealed. The court of appeals reversed the trial court's judgment in reliance on its decision in *Johnson* and directed reinstatement of the Tozers' bad faith and unfair settlement practices claims. *Tozer v. Scott Wetzel Services, Inc.,* No. 88CA1723 (Colo.App. April 19, 1990) (unpublished).

### C.

Johnson and Tozer contend that Wetzel did not act in good faith or deal fairly when processing their claims for workers' compensation benefits. Johnson asserts that Wetzel did not competently investigate the medical basis of his claim in order to determine whether the injuries actually were job-related. He argues that a proper investigation would have demonstrated that he was entitled to workers' compensation benefits. Instead, Wetzel only collected those facts that would support denial of workers' compensation benefits. Tozer contends that Wetzel appealed the administrative law judge's order awarding compensation simply to delay the payment of benefits. Both claimants argue that Wetzel, knowing that the claimants were experiencing ex-

---

**8.** For purposes of the Johnsons' appeal, the trial court obtained the agreement of the Johnsons' counsel to the following facts:

> Fact one, Safeway is self-insured for worker's compensation insurance. Two, Scott Wetzel Services, Inc. is an adjusting service totally independent of Safeway. Three, Scott Wetzel contracted with Safeway to provide adjusting services for Safeway on worker's compensa-

tion claims. Four, Scott Wetzel did not contract with Safeway or plaintiffs to provide insurance. Five, the only claim submitted to the jury was the bad faith claim and the plaintiff, in effect, abandoned the other claims.

The Johnsons' attorney stated that he had "no problem" with these facts, which the Johnsons have not contested on appeal.

treme financial hardships, employed dilatory tactics to exploit this vulnerability. Through these delays, their arguments proceed, Wetzel hoped to induce the claimants to settle for less than the fair value of their claims. As a result, the claimants had insufficient funds to pay for basic necessities, causing mental distress and financial indebtedness. Had Wetzel acted in accordance with its duty of good faith and fair dealing, the claimants' argument concludes, they would have received the proper amount of benefits in a timely fashion.

## II.

The dispositive issue in this case is whether an independent claims adjusting firm owes a duty of good faith and fair dealing to an injured claimant in investigating and processing a workers' compensation claim in the absence of contractual privity with the claimant. In order to resolve this issue, we first must determine whether the duty of good faith and fair dealing that providers of workers' compensation insurance owe to claimants of workers' compensation benefits applies as well to self-insured employers. Then, we must decide whether such a duty also applies to an independent claims adjusting service. We conclude that the duty of good faith and fair dealing applies in both instances.

### A.

Although this case presents an issue of first impression in Colorado, we have previously considered the nature of an insurance company's duties in processing claims in other contexts. These cases provide useful guidance in resolving the issue now before us.

The tort of "bad faith breach of an insurance contract" was first recognized in Colorado by the Colorado Court of Appeals in 1982. *See Farmers Group, Inc. v. Trimble ("Trimble I")*, 658 P.2d 1370, 1375–76 (Colo.App.1982). That case involved the assertion of a claim by an insured that his liability insurer had acted in bad faith in defending against claims asserted against the insured by a third party. In *Farmers Group, Inc. v. Trimble ("Trimble II")*, 691 P.2d 1138, 1141 (Colo.1984), we affirmed *Trimble I* on certiorari review and explained our rationale for recognizing the tort:

> The duty of the insurer to act in good faith when dealing with its insured is characterized in many jurisdictions as a duty implied by law as a covenant of the insurance contract. In *Gruenberg v. Aetna Ins. Co.*, 9 Cal.2d 566, 575, 108 Cal.Rptr. 480, 486, 510 P.2d 1032, 1038 (1973), the California Supreme Court stated,
>
> > in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is [immanent] in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

(Brackets in *Trimble II*.) We noted that insurance serves to protect individuals against financial calamity. In essence, the insured purchases financial and emotional security. "The refusal of the insurer to pay valid claims without justification, however, defeats the expectations of the insured and the purpose of the insurance contract." *Trimble II*, 691 P.2d at 1141. We therefore held that an insurer has a legal duty to deal with its insured in good faith. *Id.*

We also held in *Trimble II* that general principles of negligence will govern the standard by which the adherence of an insured to its duty of good faith will be assessed. *Id.* at 1142. In arriving at this conclusion, we observed,

> [t]he standard of conduct on the part of the insurer when dealing with claims arising under an insurance policy is shaped by, and must reflect, the quasi-fiduciary relationship that exists between the insurer and the insured by virtue of the insurance contract. Particularly when handling claims of third persons that are brought against the insured, an

insurance company stands in a position similar to that of a fiduciary. *Id.* at 1141. We noted that the quasi-fiduciary nature of the insurer-insured relationship stemmed from the insurer's ability under its policy of insurance to control the handling of a third party claim and the defense against it. *Id.*

In *Travelers Insurance Co. v. Savio*, 706 P.2d 1258, 1273 (Colo.1985), we decided that an insurance company providing workers' compensation insurance for the benefit of an employer owes a duty of good faith to an employee asserting a claim for workers' compensation benefits. We noted that under the Act the insurance contract must provide that the insurer is directly and primarily liable to the employee. *See* § 8–44–105, 3B C.R.S. (1991 Supp.). Thus, the employee can be viewed either as an insured or as a third party beneficiary with the right to sue on the insurance contract. *Savio*, 706 P.2d at 1272. The rationale of *Trimble II*, therefore, "demands that the provider of [workers'] compensation deal fairly and in good faith with an employee asserting a compensable injury." *Id.* at 1273.

In *Savio* we emphasized that the Act was adopted to protect workers from the economic calamity of disabling injuries. *Id.* at 1272. Once a calamity has befallen an employee covered by workers' compensation or an insured covered under a private insurance contract, the injured party is particularly vulnerable because of the injury or loss. *Id.* at 1273. We noted that the Supreme Court of Rhode Island once commented as follows:

> [I]nsurers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than that due under the policy .... The inequity of this situation becomes particularly apparent in the area of disability insurance in which the insured, often pursued by creditors and devoid of bargaining power, may easily be persuaded to settle for an amount substantially lower than that provided for in the insurance contract.

*Id.* at 1273 (quoting *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 318 (R.I.1980)).

In *Savio*, however, we held that the negligence standard by which the breach of an insurer's duty of good faith is to be determined in the context of a claim by a third party against the insured is not applicable when a claim is asserted by a worker against the workers' compensation insurer. When a claim is asserted by a third party, as in *Trimble II*, the insured has ceded control of defense of the action to the insurer, thus giving rise to a quasi-fiduciary relationship of the insurer to the insured. In a first-party claim for workers' compensation benefits, however, the claimant retains control, and the insurer "must be accorded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds not available under the contract of insurance." *Savio*, 706 P.2d at 1274. Accordingly, we held that in order to establish breach of the insurance carrier's duty of good faith to one asserting a claim for workers' compensation, the claimant must show that the insurer's conduct was unreasonable and that the insurer knew it was unreasonable or acted in reckless disregard of whether it was unreasonable. *Id.* at 1276.

### B.

The present case involves the assertion of a workers' compensation claim against a self-insured employer who has contracted out its claims adjusting responsibilities. The first question we must decide, therefore, is whether such an employer owes the same duty of good faith and fair dealing to an employee asserting a workers' compensation claim as does an independent insurance company providing coverage for such claims. We conclude that it does. For this purpose, we can discern no principled difference between self-insured employers and insurance companies in the context of workers' compensation law. The concerns we have identified with respect to greater financial assets and superior bargaining power are still present.

The Code of Colorado Regulations sets forth strict conditions for an employer to

become a self-insurer under the workers' compensation system. First, the employer must apply to the executive director of labor and employment for permission. 7 C.C.R. 1101–4, Part III(A)(1) (1990). It must employ at least 300 employees. *Id.*, Part III(A)(3). If an employer seeks a waiver of the 300–employee requirement, it must demonstrate to the executive director its ability to meet all obligations imposed under the Act at all times. *Id.* In considering whether to allow the waiver, the executive director may consider factors including whether the employer has assets of at least $100 million, a ratio of current assets to current liabilities of 1.5 to 1, a ratio of long-term debt to tangible net worth of 1 to 1.5, and whether the employer's accounting ratios equal or exceed industry standards. *Id.* In addition, every self-insurer must demonstrate sufficient financial strength and liquidity to assure that it will meet all of its obligations promptly. To this end, it must submit its most recent certified financial statement and show that it has been in business for not less than 5 years and must provide security of at least $300,000 to ensure payment of all workers' compensation claims. *Id.*, Part III(A)(4); *see id.*, Part V(A)(2). An employer must also carry a policy of excess insurance coverage with limits acceptable to the executive director. *Id.*, Part III(A)(4)(c). The stringent conditions for obtaining a self-insurance permit provide assurance that only financially secure employers will qualify for self-insurance. By virtue of this economic strength, self-insured employers almost certainly have superior bargaining power over their employees.

In view of our recognition that insurance companies and self-insured employers occupy similar positions with respect to workers' compensation claimants, we conclude that a self-insured employer, like a workers' compensation insurance carrier, owes a duty of good faith and fair dealing to its employees who seek benefits under the Act. These employee-claimants, no less than the disabled insured who sought benefits under a disability insurance policy in *Bibeault,* are "often pursued by creditors and devoid of bargaining power, [and] may easily be persuaded to settle for an amount substantially lower than that provided for" under the Act. 417 A.2d at 318. The rationale of our decision in *Savio* is as applicable to self-insured employers as it is to insurance companies providing workers' compensation benefits.

## C.

We now turn to the issue of whether an independent claims adjusting service such as Wetzel also owes a duty of good faith and fair dealing to a claimant asserting a right to benefits under the Act. We conclude that it does.

■ We recognize that Safeway, as a self-insured employer, cannot relieve itself of its obligation of good faith and fair dealing by contracting out its responsibilities. *See Denny's Restaurant, Inc. v. Husson,* 746 P.2d 63, 65 (Colo.App.1987). This, however, does not resolve the question of whether Wetzel also had such a duty independent of and in addition to the duty imposed on Safeway.

The duty of good faith and fair dealing owed by insurers and self-insurers to workers' compensation claimants is rooted in the Act. The regulations promulgated under the Act specifically contemplate the use of claims administration services by self-insured employers as an important part of the scheme for delivery of workers' compensation benefits by self-insured employers. When the employer acts as a self-insurer, the claims administration service plays an integral role in the provision of benefits. As previously noted, the executive director of the department of labor and employment may permit employers to act as their own workers' compensation insurance carriers. § 8–44–109, 3B C.R.S. (1986) (now codified at § 8–44–201, 3B C.R.S. (1991 Supp.)). Such self-insurers must satisfy the executive director's regulatory requirements. *Id. See also* § 8–46–108, 3B C.R.S. (1986) (now codified at § 8–47–107, 3B C.R.S. (1991 Supp.)) (director's power to adopt regulations to administer the workers' compensation system). These

regulations, contained in 7 C.C.R. 1101–4 (1990), require that "[e]ach permit holder [i.e., self-insured employer] shall have within its own organization ample facilities and competent personnel to service its own program with respect to claims and administration or *shall contract with a service company to provide the services.*" *Id.* at Part III(A)(6) (emphasis added).

The self-insurer regulatory scheme therefore specifically envisions the use of independent claims administration services to provide benefits. The executive director's annual review of the self-insurer's permit must include an evaluation of the efficiency and effectiveness of the self-insurer's claims administration. *See id.* at Part V(A)(2)(k). These requirements demonstrate the regulatory concern that workers' compensation claimants receive effective and efficient claims processing. The role of a claims adjusting service, therefore, derives not solely from its contract with the self-insured employer, but is based on statute and regulation as part of the benefit-delivery process.

Wetzel, the claims administration service acting under contract with the employer, Safeway, provided the claims administration contemplated by regulation. Wetzel processed the paperwork, investigated the claims, obtained medical reports, made initial determinations of a claimant's eligibility for benefits, and paid medical bills with checks written on its own account.[9] Through performing these services, Wetzel effectively delivered the workers' compensation benefits and took many of the steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimants.

Furthermore, because of the structure of the Act, Wetzel was aware that it was instrumental in carrying out Safeway's duties to workers' compensation claimants.

Under these circumstances, Wetzel had a duty of good faith and fair dealing to Safeway's workers' compensation claimants. *Cf. Morvay v. Hanover Ins. Cos.*, 127 N.H. 723, 506 A.2d 333, 335 (1986) (one who investigates insurance claim under contract with insurer owes a duty of reasonable care to insured as well as to insurer because insured is a foreseeably affected party); *Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 287–88 (Alaska 1980) (insurance adjuster owes duty of ordinary care to insured even though adjuster's contract is with insurance company only).[10]

■ We act with an eye towards serving the purposes behind the workers' compensation system. The Act has the humanitarian purpose of assisting injured workers and their families, *Claimants in Matter of Death of Garner v. Vanadium Corp.*, 194 Colo. 358, 360, 572 P.2d 1205, 1207 (1977), by giving them a reliable source of compensation, *Engelbrecht v. Hartford Accident & Indem. Co.*, 680 P.2d 231, 233 (Colo. 1984). One of the purposes of the Act is to provide a method whereby claims arising out of employment-related accidents may be speedily resolved. *Industrial Comm'n v. Globe Indem. Co.*, 145 Colo. 453, 456, 358 P.2d 885, 886 (1961). "The Workmen's Compensation Act was intended to supply every employee within its protection with a more or less summary and speedy procedure ... to recover compensation for any injury from an industrial accident occurring in the course of his employment and arising out of it." *Industrial Comm'n v. Schaefer Realty Co.*, 98 Colo. 445, 446, 56 P.2d 51, 51 (1936). In the absence of an obligation to deal in good faith and fairly, self-insured employers and claims adjusting services may create obstacles to payment. This kind of delaying tactic runs counter to the goals of workers' compensation. Ac-

9. Prior to the stipulated dismissal of Safeway in the *Johnson* case, Safeway argued that it retained no administrative control and made no administrative decisions with respect to workers' compensation claims. Such administrative matters, according to Safeway, were handled exclusively by Wetzel.

10. For the purpose of our analysis it is not significant whether the claims adjusting service is an independent contractor or an agent of the employer. It is the statutory and regulatory structure and the adjuster's participation in the investigation and processing of claims that give rise to the duty and not the contract between the employer and claims adjusting service, or the law of principal and agent.

cordingly, we hold that an independent claims adjusting company, such as Wetzel, acting on behalf of a self-insured employer owes a duty of good faith and fair dealing to an injured employee in investigating and processing a workers' compensation claim even in the absence of contractual privity with the employee.

Therefore, we affirm the judgments of the Colorado Court of Appeals remanding for reinstatement of the claims for Wetzel's alleged breaches of its duties of good faith and fair dealing and for further proceedings consistent with the views expressed in this opinion.[11]

ROVIRA, C.J., concurs in part and dissents in part.

VOLLACK, J., joins in the concurrence and dissent.

Chief Justice ROVIRA concurring in part and dissenting in part:

While I agree that a self-insured employer owes a duty of good faith and fair dealing to its employees who seek benefits under the Workers' Compensation Act (the Act) and that this duty cannot be delegated to a claims adjusting service, I do not agree that such a duty is owed by a claims adjusting service such as Wetzel that provides no benefits to the employee. Therefore, because the majority improperly expands the category of persons or entities potentially liable for the tort of bad-faith processing of a compensation claim, I respectfully dissent.

I

We have often recognized that certain duties, whether defined by statute or common law, are nondelegable. The Act imposes an obligation on an employer to secure compensation for its employees for injuries suffered in the course of employment. § 8–44–101(1), 3B C.R.S. (1986).

Recognizing that "workers compensation serves the same purpose as insurance in general," we have previously held that there is a duty on the part of the provider of such compensation to "deal fairly and in good faith with an employee asserting a compensable injury." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273 (Colo.1985). The Act does not permit an employer "to appoint an agent, other than an insurer, and unilaterally vest it with the rights and *responsibilities* assigned either to employers or insurers by the Workmen's Compensation Act." *Denny's Restaurant, Inc. v. Husson*, 746 P.2d 63, 65 (Colo.App.1987) (emphasis added). Therefore, since in *Savio*, we found that the responsibility to deal fairly and in good faith arises from the underlying purpose of the Act, I agree with the majority's conclusion (*see* maj. op. at 811) that Safeway cannot relieve itself of its obligation of good faith by contracting out its responsibilities.

II

I disagree, however, with the majority's conclusion that, based on the statutory and regulatory structure of the Act, a claims adjusting company hired by and acting on behalf of a self-insured employer, owes an independent duty of good faith and fair dealing to an employee in the investigation and processing of a workers' compensation claim. I believe, conversely, that neither the decisions of this court, the statutory and regulatory structure of the Act, nor the laws of agency support an extension of such a duty to independent claims adjusting companies.

A

The imposition of the duty to claims adjusting companies cannot be said to arise from our holding in *Savio*. In *Savio*, we adopted the rationale of *Farmer's Group*,

---

11. In *Johnson*, the court of appeals directed reinstatement of the complaint. The trial court determined, however, before submitting the case to the jury that all the plaintiffs' claims except the bad faith claim had been abandoned. The court of appeals should reconsider the breadth of its directions for reinstatement in

view of this fact. In *Tozer*, the court of appeals directed reinstatement of the unfair settlement practices claim. The trial court had dismissed that claim for reasons not related to issues on appeal. The court of appeals should also reconsider its directions to reinstate that claim.

*Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984). The *Trimble* rationale states that an insurer's duty of good faith to its insured when handling claims of third parties against the insured arises from the nature of insurance. *Trimble,* 691 P.2d at 1141. Adopting this rationale in *Savio,* we concluded that, since "workers compensation serves the same purpose as insurance in general, the *Trimble* rationale demands that the *provider of such compensation* must deal fairly and in good faith with an employee asserting a compensable injury." *Savio,* 706 P.2d at 1273 (emphasis added). Recognizing that the compensation funds came from Safeway and that Safeway was charged with the statutory duty to provide compensation, § 8–44–101(1), 3B C.R.S. (1986), it is clear that Wetzel was not a provider of compensation to either Johnson or Tozer within the meaning of *Savio.* Wetzel was neither Johnson's or Tozer's employer nor the insurer of their employer but simply the administrative processor of the claims. Therefore, the decision of this court imposing the obligation of fair dealing and good faith on compensation providers cannot be the basis for extending liability for breach of such duties to entities such as Wetzel who are not providers of compensation.

### B

The regulatory structure of the Act, while demonstrating concern that workers' compensation claimants receive efficient claims processing (*see* maj. op. at 811–812), establishes that the entity obligated to provide efficient claims administration is the self-insured employer. *See* 7 Colo.Code Regs. §§ 1101–04 at Part V(A)(2)(k) (1990) (Whether the self-insured employer services its own program with respect to claims and administration or contracts with a service company to provide the services, the self-insured employer is subject to annual review of its permit. The review must include an evaluation of the efficiency and effectiveness of the self-insurer's claims administration.). So, while recognizing the use of independent claims administration services (*see id.* at Part III(A)(5)), the regulatory scheme holds only the self-insurer

responsible. It has no provision regulating the independent claims adjusting company, thus indicating that the regulatory scheme envisioned an independent obligation on the part of insurance adjusting companies directly to the insured employees.

### C

Furthermore, while the majority declines to examine the law of principal and agent, I find that well settled agency principles support a conclusion that Wetzel did not independently owe a duty of good faith and fair dealing to Johnson and Tozer. Under agency law, obligations arise and are imposed based on the nature of the relationship between the parties. I begin, therefore, by examining the nature of Safeway and Wetzel's relationship.

An agent is one who acts for or in the place of another by authority from him, or who is entrusted with the business of the other. *Pouppirt v. Greenwood,* 48 Colo. 405, 407, 110 P. 195, 196 (1910); *Governor's Ranch Professional Center, Ltd. v. Mercy of Colorado, Inc.,* 793 P.2d 648, 651 (Colo.App.1990). An independent contractor is one who engages to perform services for another, according to his own methods and manner, free from the direction and control of the employer in all matters relating to performance of the work. *Continental Bus System, Inc. v. N.L.R.B.,* 325 F.2d 267, 271 (D.Colo.1963); *Restatement (Second) of Agency* § 2(3) cmt. b (1958).

In the Johnson case, the trial court, in its order finding that Wetzel was legally capable of committing a tort despite the absence of privity of contract, characterized Wetzel as an independent contractor adjusting company. I agree. As the majority points out, Johnson's counsel agreed that Wetzel is an adjusting service totally independent of Safeway, that Wetzel contracted with Safeway to provide adjusting services for Safeway on workers' compensation claims, and that Wetzel did not contract with either Safeway or Johnson to provide insurance. As noted above, Wetzel was performing the administrative work in adjusting workers' compensation claims, a

function statutorily assigned to Safeway as a self-insured employer. Wetzel performed this claims administration work for numerous large self-insured employers throughout the country by initially investigating claims, including receiving the first report of injuries from the employer, setting up files, requesting medical reports, and making the necessary filings with the division of labor. In the performance of ministerial tasks, such as how the files should be set up or reports requested, Wetzel was free of control by Safeway and was performing the claims administration services as an independent contractor.

An independent contractor may or may not be an agent. *Restatement (Second) of Agency* § 2(3) (1958). "An agent ... is ... an independent contractor when he contracts to act on account of the principal." *Id.* at cmt. b. Yet, an independent contractor is not an agent where he is not a fiduciary, has no power to make the one employing him a party to a transaction, and is subject to no control over his conduct. *Id.* Since the regulatory scheme places the burden for administration of claims on the self-insured party, an independent claims adjusting company which the self-insured entity authorizes to administer claims on its behalf is acting as an agent for the self-insurer.[1] Any action in claims processing taken by Wetzel bound Safeway because, as noted above, Safeway could not delegate its duty of good faith and fair dealing in processing claims to Wetzel. Wetzel was subject to control by Safeway over decisions that transcended administrative details. The majority points out that Safeway and Wetzel held monthly meetings where Wetzel gave input on how the cases should be handled, but the funds dispensed by Wetzel to claimants were supplied by Safeway, and Safeway resolved all the controversial issues of liability and selected the necessary medical providers and attorneys. Consequently, I conclude that Wetzel's role was that of an independent contractor agent.

Just as "[a]n insurance adjuster ... represents his employer, to whom he owes faithful work, and for whose acts in the employer's interest the employer is responsible so long as the acts are done while the *agent* is acting within the scope of his employment," 16A J. Appleman & J. Appleman, *Insurance Law & Practice* § 8890.35 at 541 (1981) (emphasis added), an independent claims adjusting company represents the self-insurer and the self-insured entity is responsible for acts done by the agent within the scope of its employment. *See State ex rel. Ranni Assoc. v. Hartenbach,* 742 S.W.2d 134, 140 (Mo.1987) (principal, and not agent, liable for economic loss suffered by beneficiaries of life insurance policy for acts performed by agent within scope of its authority). Whether that also relieves the claims adjustment company of liability hinges on the nature of the duty.

Liability for an agent's breach of a nondelegable duty remains with the principal. *See Restatement (Second) of Agency* § 216 (1958). Here, the majority determined that Safeway's duty of fair dealing and good faith is nondelegable. *See* maj. op. at 811. Consequently, agency principles do not support a finding that Wetzel owed an independent duty of good faith and fair dealing to compensation claimants.

**D**

Finally, the majority states that Wetzel owes a duty to employees because, based on the structure of the Act, Wetzel was aware of the importance of its role in carrying out Safeway's duties to workers' compensation claimants and by imposing a duty of fair dealing and good faith on claim adjusting companies, the humanitarian purpose of the Act is served. I believe that the humanitarian purpose of the Act evidenced by the statutory and regulatory structure is equally served without extending liability for the tort of bad faith to independent claims adjusting companies. If, as asserted, Wetzel improperly processed Johnson's and Tozer's claims, the

---

1. In their separate complaints, Johnson and Tozer both sued Wetzel as an agent of Safeway, claiming that Safeway, through its agent Wetzel,

acted unreasonably, and that Wetzel, acting upon instructions from its principal, Safeway, acted unreasonably.

remedy was to seek damages against Safeway. Neither the regulatory or statutory schemes of the Act nor the law of agency supports the imposition of a duty of good faith and fair dealing owed by Wetzel to compensation claimants.

Accordingly, I respectfully dissent and would reverse the judgments of the court of appeals.

I am authorized to state that Justice VOLLACK joins in this concurrence and dissent.