2013 COA 133

Kirsten K. RICCATONE;  Brian Riccatone;  and Ashlee D. Duran, Plaintiffs–Appellants,

v.

COLORADO CHOICE HEALTH PLANS, d/b/a San Luis Valley Health Maintenance Organization;  Gallagher Benefit Services, Inc., a Delaware corporation; and CNIC Health Solutions, Inc., a Colorado corporation, Defendants–Appellees.

Court of Appeals No. 12CA1197

Colorado Court of Appeals,
Div. II.

Announced September 12, 2013

Arapahoe County District Court No. 08CV2779, Honorable Charles M. Pratt, Judge

Burg Simpson Eldredge Hersh & Jardine, P.C., Nelson Boyle, Englewood, Colorado, for Plaintiffs–Appellants

Hall & Evans, L.L.C., Malcolm S. Mead, Kevin E. O'Brien, Cristin J. Mack, Denver, Colorado, for Defendant–Appellee Colorado Choice Health Plans

Overturf McGath Hull & Doherty, P.C., Richard K. Rediger, Denver, Colorado, for Defendant–Appellee Gallagher Benefit Services, Inc.

Hoskin Farina & Kampf, David M. Dodero, Andrew H. Teske, Grand Junction, Colorado, for Defendant–Appellee CNIC Health Solutions, Inc.

Opinion by JUDGE KAPELKE *

¶ 1 Plaintiffs, Kirsten K. Riccatone, Brian Riccatone, and Ashlee D. Duran, appeal from the summary judgments entered by the district court in favor of defendants, Colorado Choice Health Plans, doing business as San Luis Valley Health Maintenance Organization (Choice), Gallagher Benefit Services,

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

Inc. (GBS), and CNIC Health Solutions, Inc. (CNIC). We affirm.

## I. Background

¶ 2 Plaintiffs are plan participants under the San Luis Valley Combined Educators Health Plan (the Plan). The Plan is an employer self-funded health care plan. Choice and CNIC are, respectively, the current and former third-party administrators for the Plan. GBS is a broker and advisor for the Plan.

¶ 3 In 2007, Duran was severely injured in a single-vehicle car accident. Shortly after the accident, her blood tested positive for alcohol. Because Duran was sixteen years old at the time of the accident, the Plan denied benefits pursuant to a provision excluding from coverage injuries resulting from the illegal use of alcohol.

¶ 4 Plaintiffs initially brought suit against CNIC and Choice for breach of contract, bad faith breach of insurance contract, and unreasonable denial of insurance benefits under section 10–3–1116(1), C.R.S.2012. Plaintiffs amended their complaint to add the Plan as a defendant. Following some discovery, plaintiffs again amended their complaint to add GBS as a defendant.

¶ 5 CNIC moved for summary judgment, and the court granted the motion. Thereafter, GBS and Choice also moved for summary judgment. Plaintiffs and the Plan entered into a settlement agreement, and plaintiffs' claims against the Plan were dismissed.

¶ 6 Plaintiffs then asked the court to reconsider its summary judgment in favor of CNIC and moved to amend their complaint to add claims against CNIC, GBS, and Choice of aiding and abetting tortious conduct. The court denied plaintiffs' motions and granted summary judgment in favor of GBS and Choice on plaintiffs' bad faith breach of insurance contract claims. Following additional briefing, the court also granted summary judgment in favor of GBS and Choice on plaintiffs' statutory claims under

§ 24-51-1105, C.R.S. 2012.

section 10–3–1116(1). On appeal, plaintiffs challenge those summary judgments, as well as the court's denial of their motion to amend the complaint.

¶ 7 The court had also granted CNIC's motion for summary judgment on plaintiffs' statutory claims on the grounds that the allegedly improper actions of CNIC had occurred prior to the effective date of section 10–3–1116, C.R.S.2012. Plaintiffs do not appeal that ruling.

## II. Summary Judgment

¶ 8 Plaintiffs contend that the district court erred in granting summary judgment (1) in favor of CNIC, GBS, and Choice on plaintiffs' common law bad faith breach of insurance contract claims; and (2) in favor of GBS and Choice on plaintiffs' claims for unreasonable denial of insurance benefits under section 10–3–1116(1). We reject the contentions.

## A. Standard of Review

¶ 9 We review an order granting summary judgment de novo. *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1082 (Colo.2009). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *accord D.R. Horton, Inc.–Denver v. D & S Landscaping, LLC*, 215 P.3d 1163, 1166 (Colo.App. 2008).

¶ 10 Summary judgment is a drastic remedy that is never warranted unless there is a clear showing that there is no genuine issue of material fact. *D.R. Horton, Inc.*, 215 P.3d at 1166. A genuine issue of material fact is one which, if resolved, will affect the outcome of the case. *ACJ P'ship*, 209 P.3d at 1082. We must give the nonmoving party the benefit of all favorable inferences drawn from the undisputed facts and resolve any doubts against the moving party. *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 570 (Colo.2008).

## B. Common Law Bad Faith Claim

¶ 11 We conclude that the district court properly granted summary judgment in favor of CNIC, Choice, and GBS on plaintiffs' common law bad faith breach of insurance contract claims because these defendants do not owe a duty of good faith and fair dealing to plaintiffs.

¶ 12 Every contract in Colorado contains an implied duty of good faith and fair dealing. *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo.2003). Ordinarily, a breach of this duty does not result in independent tort liability. *Id.* However, because of the special nature of an insurance contract relative to other kinds of contracts and the special relationship that exists between the insurer and the insured, a breach of this duty in an insurance contract gives rise to a separate cause of action sounding in tort. *Id.*; *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo.1984).

¶ 13 Thus, to establish a bad faith breach of insurance contract claim against a defendant, a plaintiff must prove that the defendant owed him or her a duty of good faith and fair dealing in investigating and processing his or her claim. *Cary*, 68 P.3d at 465. The existence and scope of that duty are questions of law. *Id.*

¶ 14 Typically, only an insurer owes a duty of good faith to its insured. *Id.* at 466. "[A]gents of the insurance company— even agents involved in claims processing – do not owe a duty, since they do not have the requisite special relationship with the insured." *Id.*; *see also Martinez v. Lewis*, 969 P.2d 213, 214 (Colo.1998) (independent medical evaluation physician not bound by duty of good faith with regard to the claims adjustment process); *Gorab v. Equity Gen. Agents, Inc.*, 661 P.2d 1196, 1198 (Colo.App.1983) (insurance agent not bound by duty of good faith arising from insurance carrier's contract).

¶ 15 Despite this limitation, an insured is ordinarily adequately protected, because the duty imposed on an insurer is nondelegable, preventing the insurer from escaping liability by delegating tasks to third

parties. *Cary*, 68 P.3d at 466. The existence of this nondelegable duty, however, does not mean that a third party that investigates and processes an insured's claim *never* has an independent duty of good faith. *Id.*

¶ 16 In *Cary*, the supreme court imposed a duty of good faith and fair dealing on third party administrators who ran a self-funded health insurance program on behalf of the City of Arvada. The court noted that the administrators "fulfilled virtually all of the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits." *Id.* at 468. Further, the court emphasized that, because the third party administrators had entered into a reinsurance program under which they had agreed to *insure* claims payments between $75,000 and $1 million, the administrators "had a significant financial incentive to delay payment of benefits or coerce [the insured] into a diminished settlement." *Id.* Based on these factors, the court held that "[w]hen a third-party administrator performs many of the tasks of an insurance company *and bears some of the financial risk of loss for the claim*, the administrator has a duty of good faith and fair dealing to the insured in the investigation and servicing of the insurance claim." *Id.* at 469 (emphasis added).

■ ¶ 17 Thus, under *Cary*, the duty of good faith and fair dealing supporting a bad faith claim extends to third parties who (1) perform the functions of an insurer *and* (2) have a financial incentive to limit an insured's claims. *Id.*; *see also Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348, 353 (Colo.1997) (noting a surety's incentive to refuse payment and force an insured into a settlement for a reduced amount).

■ ¶ 18 We therefore conclude that, absent a financial incentive to deny an insured's claims or coerce a reduced settlement, a third party that investigates and processes an insurance claim does not owe a duty of good faith and fair dealing to the insured. *Cary*, 68 P.3d at 469. To conclude otherwise would vitiate those cases that decline to extend this duty to individuals merely involved in claims processing—an outcome the *Cary* court expressly rejected. *See id.* at 468 n. 8.

¶ 19 Relying on *Scott Wetzel Services, Inc. v. Johnson*, 821 P.2d 804 (Colo.1991) (*Wetzel*), plaintiffs argue that the lack of a financial incentive is not dispositive of our duty inquiry. Initially, we note that the claims administrator in *Wetzel* may have had a financial incentive to delay or deny payment of claims. *See* 821 P.2d at 812 (noting that the administrator paid medical bills with checks written on its own account).

¶ 20 In any event, the *Wetzel* court explicitly based its holding on the duty arising from the statutory and regulatory structure of the Workers' Compensation Act, not from a duty arising from contract. 821 P.2d at 812 n. 10. Consequently, *Wetzel* is inapposite.

¶ 21 Here, the undisputed record establishes that defendants collectively fulfilled most of the functions ordinarily performed by an insurance company in processing claims and determining whether to pay insurance benefits. Unlike the administrators in *Cary*, however, defendants here had no financial incentive to delay payment or coerce a diminished settlement. Indeed, their compensation was unaffected by the approval or denial of benefits or the amount of settlements, and they did not provide any reinsurance coverage for claims against the Plan, or otherwise bear any risk of loss associated with the payment of benefits.

¶ 22 Because defendants did not have a financial incentive to deny or limit plaintiffs' claims, we conclude that the district court properly granted summary judgment in favor of defendants on plaintiffs' common law bad faith breach of insurance contract claims.

### C. Statutory Claims

¶ 23 We conclude that the district court properly granted summary judgment in favor of GBS and Choice on plaintiffs' claim for unreasonable denial of insurance benefits under section 10–3–1116(1) because neither GBS nor Choice was a proper defendant under the statute.

### 1. Relevant Law

¶ 24 Our primary goal in construing a statute is to determine and give effect to the

legislative intent. *Spahmer v. Gullette,* 113 P.3d 158, 161–62 (Colo.2005). In doing so, we look first to the plain language of the statute, giving the words and phrases used therein their plain and ordinary meanings. *Id.*

¶ 25 Statutory language "must be read in the context of the statute as a whole and the context of the entire statutory scheme." *Jefferson Cnty. Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 935 (Colo.2010). We must give consistent, harmonious, and sensible effect to all the statute's parts, *id.* and avoid interpretations that would render any words or phrases superfluous or would lead to illogical or absurd results. *CLPF–Parkridge One, L.P. v. Harwell Invs., Inc.,* 105 P.3d 658, 661 (Colo.2005).

¶ 26 When statutory language is unclear, ambiguous, or susceptible of different interpretations, "we look to sources of legislative intent, including the object the legislature sought to obtain by the enactment, the circumstances under which it was adopted, and the consequences of a particular construction." *Id.* "We may consider the statute's declaration of purpose, its title, and its legislative history in construing legislative intent." *Id.*; *see also* § 2–4–203, C.R.S.2012 (suggesting aids in construction of ambiguous statutes).

### 2. Analysis

¶ 27 Here, section 10–3–1116(1) provides first-party claimants a private right of action when their claim for payment of benefits has been unreasonably delayed or denied. *See Kisselman v. Am. Family Mut. Ins. Co.,* 292 P.3d 964, 972 (Colo.App.2011). The statute provides that such a first party claimant "may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." § 10–3–1116(1). While section 10–3–1116 does not specify who may be liable for such a claim, it references section 10–3–1115, C.R.S. 2012, which provides that "[a] person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." § 10–3–1115(1)(a), C.R.S.2012.

¶ 28 As an initial matter, we note that sections 10–3–1115 and –1116 did not become effective until August 5, 2008. Because statutes are presumed to be prospective in their application, § 2–4–202, C.R.S.2012, and plaintiffs do not dispute that the statutes here apply only prospectively, we review the validity of plaintiffs' statutory claims against GBS and Choice only to the extent they are premised on conduct occurring after August 5, 2008. *See Vaccaro v. Am. Family Ins. Grp.,* 2012 COA 9, ¶ 27, 275 P.3d 750, 757 (concluding the statutes create a right of action available for acts occurring after August 5, 2008, but declining to address retroactive application of the statutes).

¶ 29 In evaluating plaintiffs' statutory claims, the district court concluded that neither GBS nor Choice was a "person engaged in the business of insurance." Under the circumstances here, we agree with that conclusion.

¶ 30 The General Assembly has not specifically defined who is a "person engaged in the business of insurance"; nor has it defined what constitutes the "business of insurance." However, in defining unreasonable conduct, the General Assembly referred to an "insurer," rather than a "person engaged in the business of insurance": "[F]or the purposes of an action brought pursuant to this section and section 10–3–1116, an *insurer's* delay or denial was unreasonable if the *insurer* delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." § 10–3–1115(2), C.R.S.2012 (emphasis added).

¶ 31 The general provisions of the insurance statutes define "insurer" as a "person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." § 10–1–102(13), C.R.S. 2012. And "insurance" is defined as "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies, and includes annuities." § 10–1–102(12), C.R.S.2012.

¶ 32 In light of the legislature's reference to "insurer" in section 10–3–1115, one could reasonably interpret the term "person en-

gaged in the business of insurance" to refer only to a person who "undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies." § 10–1–102(12)–(13). Indeed, the district court reached this very conclusion.

¶ 33 In its analysis, however, the court did not consider section 10–3–1102(3), C.R.S. 2012, which states that, for the purposes of part 11 of the insurance statutes:

> "Person" means any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, nonadmitted insurer, fraternal benefit society, and other legal entities *engaged in the insurance business,* including agents, limited insurance representatives, agencies, brokers, surplus line brokers, and adjusters. Such term shall also include medical service plans and hospital service plans regulated under parts 1 and 3 of article 16 of this title and health maintenance organizations regulated under parts 1 and 4 of article 16 of this title. Such plans and organizations shall be deemed to be *engaged in the business of insurance* for purposes of this part 11 only.

(Emphasis added.)

¶ 34 Under this definition, individuals or entities "engaged in the insurance business" include agents, brokers, and adjusters. Although this provision separately refers to "engaged in the business of insurance" and "engaged in the insurance business," we discern little meaningful difference between these two phrases. Thus, one could also reasonably interpret "a person engaged in the business of insurance" to encompass all those included under the definition of "person" as described in section 10–3–1102(3).

¶ 35 Both of the two possible interpretations we have identified have plausible merit. The legislature is, of course, aware of what constitutes an insurer and could have limited section 10–3–1115(1)(a) to only insurers had it desired to do so. *See, e.g.,* § 10–3–1108(1)(a), C.R.S 2012 (providing for greater penalties for violation of unfair methods of competition if a person is an "insurer"); § 10–3–1113(1), C.R.S.2012 (providing that in a civil action against an "insurance compa-

ny," the trier of fact may be instructed that the "insurer" owes a duty of good faith and fair dealing); § 10–4–415(1)(a)-(f), C.R.S. 2012 (providing that "[n]o insurer" shall engage in particular anticompetitive behavior).

¶ 36 Similarly, had the legislature intended to apply section 10–3–1115(1)(a) to all those included within the definition of "person," it could have made that intention clear. *See, e.g.,* § 10–3–1103, C.R.S. 2012 ("[n]o person" shall engage in specified unfair or deceptive trade practices in the business of insurance); § 10–3–1107, C.R.S.2012 (permitting the commissioner of the division of insurance to conduct a hearing when he or she has reason to believe that "any person" has engaged in a deceptive trade practice).

¶ 37 Because the meaning of "a person engaged in the business of insurance" in section 10–3–1115(1)(a) is susceptible of more than one reasonable interpretation, we conclude that it is ambiguous. *See Pham v. State Farm Auto. Ins. Co.,* 2013 CO 17, ¶ 13, 296 P.3d 1038, 1043. Thus, we must turn to additional sources of legislative intent to discern its meaning. *CLPF–Parkridge One, L.P.,* 105 P.3d at 661.

¶ 38 We discern some guidance from the title of the act enacting sections 10–3–1115 and –1116. *See Conrad v. City of Thornton,* 191 Colo. 444, 449, 553 P.2d 822, 826 (1976) ("[T]he title of an act may be referred to as an aid in determining the legislative intent."). House Bill 08–1407, as signed by the Governor, was titled an act "concerning strengthening penalties for the unreasonable conduct of an *insurance carrier,* and making an appropriation in connection therewith." (Emphasis added.) Thus, the title suggests the legislature intended a narrower class of defendants than that asserted by plaintiffs.

¶ 39 Turning to the legislative history of House Bill 08–1407, we note that the sponsor's statements concerning the bill's purpose are accorded substantial weight. *See Kisselman,* 292 P.3d at 972 (quoting *Meyerstein v. City of Aspen,* 282 P.3d 456, 466 (Colo.App. 2011)).

¶ 40 Here, during the hearing before the House Committee of Business Affairs and

Labor, Speaker Romanoff, the bill's sponsor, referred primarily to the actions of "insurers," "insurance carriers," and "insurance companies" when describing the bill. When asked about the possible liability of third-party administrators, Speaker Romanoff stated, "[W]e are looking to clarify what it means to be engaged in the business of insurance or an insurer, so that we can delineate the responsibility that attends to the [insurance] carrier versus, as you are describing, the third party administrator." Hearings on H.B. 1407 before the H. Comm. on Business Affairs & Labor, 66th Gen. Assem., 2d Sess. (Apr. 24, 2008). Despite this comment, the legislature did not specifically address whether third-party administrators could be liable under section 10–3–1116(1).

¶ 41 Notably, however, Speaker Romanoff referred to the common law standard for a bad faith breach of insurance contract claim when explaining the bill:

> There is an existing standard in the law that requires an insurer to uphold the duty of good faith and fair dealing. But, the standard at least as caselaw has defined it is, a breach of that duty occurs when the insurer either knew that its delay or denial was unreasonable, which is hard for anybody to prove what the company or anyone actually knew, or when the insurer recklessly disregarded the fact that its delay or denial was unreasonable. And, again, I think, reckless, willful, wanton, knowing, those standards are pretty high.

Hearings on H.B. 1407 before the H. Comm. on Business Affairs & Labor, 66th Gen. Assem., 2d Sess. (Apr. 24, 2008). He described the common law standard as "too high," and clarified that the purpose of the bill was to create a less onerous standard in the first-party context. *Id.*

¶ 42 Thus, although sections 10–3–1115 and –1116 provide a private right of action "in addition to and different from common law bad faith claims," *Kisselman,* 292 P.3d at 972, we conclude that the issue of who may be liable under these sections is informed by the common law. *See Montes v. Hyland Hills Park & Recreation Dist.,* 849 P.2d 852, 854 (Colo.App.1992) ("[I]f a plain reading of a statute does not reveal the legislative intent, we may interpret the statute by considering laws upon the same or similar subjects."); *see also* § 2–4–203 (if a statute is ambiguous, courts may consider, among other things, the object sought to be attained, the circumstances under which the statute was enacted, the legislative history, and the common law or former statutory provisions, including laws upon the same or similar subjects).

¶ 43 As evidenced by Speaker Romanoff's comments, the purpose of the statutes was to create a private right of action and to reduce the showing required under the common law standard; however, there is no indication that its purpose was either to expand or restrict the realm of possible defendants. Consequently, we conclude that, for the purposes of a claim under section 10–3–1116(1), "a person engaged in the business of insurance" includes only those individuals or entities against whom a common law claim of bad faith breach of insurance contract would lie.

¶ 44 The resulting consequences of a broad interpretation of the term "person engaged in the business of insurance" lends further support for our conclusion. *See People v. Zapotocky,* 869 P.2d 1234, 1238 (Colo.1994) ("A court ... may consider the consequences of a particular construction when determining the legislature's intent."); *see also* § 2–4–203. Expanding statutory liability to claims administrators and advisors not ordinarily subject to a common law suit would have a chilling effect on their use in the insurance industry:

> Insurance is a highly uncertain and risky endeavor, because it requires accurate predictions about the occurrence and cost of future events. Insurers are able to define and limit the risks, and to set premium levels commensurate with the risks, using complex and nuanced contracts (policies). By contrast, adjusters hired by insurers have no contract with insureds, and thus no ability to define or circumscribe their potential risks or liabilities to insureds. If adjusters faced [statutory] liability to insureds, market forces would tend to drive adjusting activities in-house.... Thus, imposing [liability] would reduce, perhaps severely, the offering of independent adjuster services. Yet

widespread market acceptance has shown these services to be useful and desirable.

Those adjusters continuing to operate independently despite imposition of [statutory liability] would attempt to buy insurance against this liability, or create their own cash reserves, adding these costs to their charges, and passing them on to the insurers who used the adjusters' services. These insurers, in turn, would add the cost to the premiums charged to insureds. The insureds thus would end up paying more for insurance without obtaining more value because ... adjuster liability would provide only a redundant source of the recovery usually available from the insurer.

*Sanchez v. Lindsey Morden Claims Servs., Inc.*, 72 Cal.App.4th 249, 84 Cal.Rptr.2d 799, 802 (1999); *see also Martinez*, 969 P.2d at 219 (noting that imposing liability on physicians conducting insurance evaluations would "undermine insurance providers' ability to rely on [these physicians], either because physicians would be more likely to submit a report favorable to the examinee in order to avoid a subsequent law suit ... or because physicians would be less likely to perform [evaluations] altogether given the liability risks").

¶ 45 Accordingly, for the reasons discussed above, we conclude that the trial court did not err in concluding that neither Choice, as third-party administrator, nor GBS, as plan advisor, may be held liable to plaintiffs on the claim of bad faith breach of insurance contract or the statutory claim for unreasonable denial of benefits under section 10–3–1116(1). Thus, the district court properly granted summary judgment for these defendants on plaintiffs' statutory claims.

### III. Motion to Amend

¶ 46 Plaintiffs contend that the district court abused its discretion in denying their motion to amend the complaint to assert new claims against defendants for aiding or abetting a tortious act. We perceive no abuse of discretion.

¶ 47 We review a district court's denial of a motion to amend pleadings for an abuse of discretion. *Sterenbuch v. Goss*, 266 P.3d 428, 440 (Colo.App.2011). A district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 48 Once a responsive pleading has been filed, a party must seek leave of the court or written consent of the adverse party to amend. C.R.C.P. 15(a); *Vinton v. Virzi*, 2012 CO 10, ¶ 10, 269 P.3d 1242. The party seeking to amend bears the burden of demonstrating that leave should be granted. *Ajay Sports, Inc. v. Casazza*, 1 P.3d 267, 273 (Colo.App.2000).

¶ 49 District courts are encouraged to look favorably upon requests to amend, and not to place arbitrary restrictions on them. *Benton v. Adams*, 56 P.3d 81, 85 (Colo.2002). However, "leave to amend is not to be granted automatically." *Varner v. Dist. Court*, 618 P.2d 1388, 1390 (Colo.1980). In many cases, delay, standing alone, may justify denial of leave to amend. *See Benton*, 56 P.3d at 85. Other applicable factors in resolving a request to amend include a bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opponent by virtue of the amendment, and futility of the amendment. *Vinton*, 269 P.3d at 1246. The moving party carries the burden of demonstrating a lack of knowledge, mistake, inadvertence, or other reason for not pleading a claim earlier. *Polk v. Denver Dist. Court*, 849 P.2d 23, 27 (Colo. 1993).

¶ 50 Here, the district court denied plaintiffs' motion to amend based on plaintiffs' undue delay and their repeated failure to cure deficiencies in their pleadings through prior amendments. The district court also found that the amendment would be futile. We conclude that the district did not abuse its discretion.

¶ 51 First, plaintiffs moved to amend their complaint after the district court had already granted summary judgment in favor of CNIC. Because that judgment was not set aside or vacated, the district court was not permitted to allow plaintiffs to amend the complaint to assert new claims against CNIC. *See Estate of Hays v. Mid–Century*

*Ins. Co.,* 902 P.2d 956, 959 (Colo.App.1995) (trial court erred by granting the plaintiff leave to amend complaint after granting summary judgment in favor of the defendant).

¶ 52 Second, plaintiffs had previously amended their complaint twice, and when they moved to amend the complaint for a third time, the case had already been pending for approximately three years and discovery had been completed for well over a year. Neither here, nor in the district court, have plaintiffs asserted lack of knowledge, mistake, inadvertence, or any other reason for not pleading their proposed amended claims earlier. Thus, under the circumstances, we conclude that the district court did not abuse its discretion in denying plaintiffs' motion for leave to amend their complaint for a third time. *See Polk,* 849 P.2d at 27. In light of our conclusion, we need not address whether the district court correctly concluded that such an amendment would have been futile.

¶ 53 The judgment is affirmed.

JUDGE CASEBOLT and JUDGE PLANK * concur.