1
 2026 CO 26 Hertz Corporation, Petitioner v. Stanislav Babayev and Oleg Chikov, Respondents No. 24SC183Supreme Court of Colorado, En BancApril 27, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 23CA117
 
 
          Judgment
 Reversed
 
 
          
 Attorneys for Petitioner: Covington & Burling LLP Allan
 B. Moore Lauren Willard Zehmer Washington, District of
 Columbia.
 
 
           Davis
 Graham & Stubbs LLP Theresa Wardon Benz, Denver,
 Colorado.
 
 
          
 Patterson Ripplinger, P.C. Franklin D. Patterson Greenwood
 Village, Colorado.
 
 
          
 Attorneys for Respondents: Western Slope Law Nelson A.
 Waneka, Glenwood Springs, Colorado.
 
 2
 
          
 Galperin and Associates Jacob Galperin Jordan Willison,
 Denver, Colorado.
 
 
          
 Attorneys for Amicus Curiae American Car Rental Association:
 Spencer Fane LLP Evan Bennett Stephenson Hannah S. McCalla,
 Denver, Colorado.
 
 
          
 Attorneys for Amicus Curiae Colorado Division of Insurance:
 Philip J. Weiser, Attorney General Heather Flannery, First
 Assistant Attorney General Evan Spencer, Senior Assistant
 Attorney General Gabriel Young, Assistant Attorney General
 Denver, Colorado.
 
 
          
 Attorneys for Amici Curiae Colorado Trial Lawyers Association
 and American, Association for Justice: Levin Sitcoff PC Robyn
 Levin James W. Hart, Denver, Colorado.
 
 
          
 Attorneys for Amicus Curiae Truck Renting and Leasing
 Association: Womble Bond Dickinson (US) LLP Kendra N.
 Beckwith, Denver, Colorado.
 
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, and JUSTICE
 BERKENKOTTER joined.
 
 
          
 JUSTICE HOOD, joined by JUSTICE GABRIEL and JUSTICE BLANCO,
 concurred in part and dissented in part.
 
 3
 
          
 OPINION
 
 
           SAMOUR
 JUSTICE.
 
 
          ¶1
 "If you call a tail a leg, how many legs has a dog?
 Five? No; calling a tail a leg don't make it a leg."
 Bank One Dayton, N.A. v. Limbach, 553 N.E.2d 624,
 627 n.5 (Ohio 1990) (quoting John Bartlett, The Shorter
 Bartlett's Familiar Quotations 218(d) (Christopher
 Morely ed., 1953)). This famous aphorism often attributed to
 Abraham Lincoln helps frame today's decision. Words
 cannot alter facts. One may call something whatever one
 likes, but the underlying reality remains unchanged. A dog
 has four legs, and relabeling its tail a "leg"
 doesn't magically create a fifth one. So too here.
 Plaintiffs may label the car rental company before us an
 insurer based on its involvement in claims handling and its
 significant financial incentives in resolving claims. But the
 reality remains the same: Under Colorado law, the car rental
 company does not qualify as a statutory insurer or as a
 common-law de facto insurer.
 
 
          ¶2
 The specific issue we confront today is narrow but carries
 outsized importance to the car rental industry—and
 potentially beyond: Can a car rental company be deemed an
 insurer of customers who purchase a "Liability
 Insurance Supplement" ("supplemental
 insurance") through their rental agreement and thereby
 become additional insureds on a policy listing the car rental
 company as the insured and the car rental
 company's insurer as the policy insurer? Our analysis
 focuses on two dispositive questions. First, did the
 legislature intend to
 
 4
 
 treat car rental companies offering supplemental insurance as
 insurers under title 10 of the Colorado Revised Statutes,
 which governs "Insurance"? Second, does our
 decision in Cary v. United of Omaha Life Insurance
 Co., 68 P.3d 462 (Colo. 2003), sanction the treatment of
 car rental companies offering supplemental insurance as de
 facto insurers (that is, insurers in practice) under the
 common law? We answer no to both questions.
 
 
          ¶3
 We hold that, although a car rental company may offer its
 customers supplemental insurance through its own
 insurer, that arrangement does not impose on the car
 rental company a nondelegable duty, under either statute or
 the common law, to act as an insurer. Rather, that duty
 remains where the law has placed it: with the insurer named
 on the policy providing the supplemental insurance (that is,
 with the car rental company's insurer).
 
 
          ¶4
 In so holding, we recognize that the car rental company in
 this case had both some involvement in administering
 plaintiffs' insurance claims and a significant financial
 incentive in the outcome of those claims. But, as the old
 adage reminds us, "fine feathers don't make fine
 birds." And as with many things in nature, what catches
 the eye doesn't always capture the truth.
 Cary's judicially crafted tort is limited to
 third-party administrators with both primary responsibility
 for handling insurance claims and a significant financial
 stake in the outcome of those claims. See 68 P.3d at
 468-69. Whatever else may be said about the car rental
 
 5
 
 company here, its business has never been claims handling;
 its trade has always been renting cars. Cary
 therefore furnishes no alchemy capable of transforming it
 into a de facto insurer.
 
 
          ¶5
 Because a division of the court of appeals concluded that the
 car rental company in this case was plaintiffs' statutory
 insurer and could, alternatively, be plaintiffs'
 common-law de facto insurer, we reverse its judgment. The
 district court correctly dismissed plaintiffs' complaint
 against the car rental company as a matter of law. We
 therefore remand the case to the division with instructions
 to return it to the district court for reinstatement of the
 dismissal order.[1]
 
 
          I.
 Facts and Procedural History
 
 
          ¶6
 On February 26, 2020, Roman Rakhimov, a nonparty, rented a
 car from Hertz Corporation ("Hertz"). As part of
 his rental agreement, Rakhimov opted to purchase, for an
 additional $18.85 per day, supplemental insurance, which
 included uninsured/underinsured ("UM/UIM") coverage
 for all occupants of the
 
 6
 
 rental car. The supplemental insurance provision was embedded
 within a paragraph appearing on the final page of the rental
 agreement:
 
 
 If You elect [supplemental insurance], [supplemental
 insurance] provides protection from liability for third party
 automobile claims for the difference between the liability
 limits in Paragraph 10 of the Rental Agreement and the
 maximum combined single limit of $1,000,000 for bodily
 injury, including death and property damage. [Supplemental
 insurance] also includes uninsured/underinsured motorist
 coverage (while occupying the Car) for bodily injury and
 property damage, if applicable, for the difference between
 the statutory minimum underlying limits and $1,000,000 for
 each accident.
 
 
          ¶7
 The next day, as Rakhimov was driving the rental car
 accompanied by two passengers, Stanislav Babayev and Oleg
 Chikov ("plaintiffs"), another vehicle collided
 with the rental car and fled the scene. Plaintiffs sustained
 injuries and were transported by ambulance to an emergency
 room where they received extensive treatment.
 
 
          ¶8
 As beneficiaries of the UM/UIM coverage in the supplemental
 insurance purchased by Rakhimov, plaintiffs submitted claims
 for medical expenses. The automobile insurance policy
 providing this coverage was issued by ACE American Insurance
 Company ("Chubb"), a licensed and regulated
 third-party insurer. Under the policy issued by Chubb (the
 "Chubb Policy"), Chubb was the insurer, Hertz was
 the named insured, and Rakhimov and plaintiffs were
 additional insureds.
 
 7
 
          ¶9
 Within a few weeks of plaintiffs' claims being submitted,
 Chubb's third-party claims administrator, ESIS, Inc.
 ("ESIS"), started an investigation. ESIS is a
 wholly-owned subsidiary of Chubb and is specifically
 designated under the Chubb Policy as the authorized entity
 responsible for claims handling.[2]
 
 
          ¶10
 Shortly after ESIS began reviewing plaintiffs' claims,
 one of its claims adjusters sent a letter to plaintiffs'
 counsel describing the relationship between Chubb, ESIS, and
 Hertz. Specifically, the claims adjuster stated that (1)
 neither ESIS nor Hertz was an insurance company; (2) ESIS
 acted solely as a third-party claims administrator for Chubb
 (the insurer); and (3) Hertz was the named insured under the
 Chubb Policy. The letter enclosed a copy of the Chubb Policy
 identifying Hertz as the named insured on the Declarations
 page. A few weeks later, plaintiffs' counsel followed up
 via email, making clear that everyone was singing from the
 same hymn sheet: "CHUBB insurance is responsible for all
 claims in Colorado."
 
 8
 
          ¶11
 The investigation into plaintiffs' claims spanned just
 over a year. During that timeframe, ESIS regularly
 communicated with plaintiffs' counsel, reviewed
 plaintiffs' medical records, ordered medical
 examinations, and issued some payments. Because plaintiffs
 received payments that totaled less than the medical expenses
 claimed, they filed suit against Hertz.[3] Plaintiffs'
 complaint included claims for: (1) breach of contract; (2)
 common-law bad-faith breach of an insurance contract; and (3)
 unreasonable delay or denial of insurance benefits in
 violation of sections 10-3-1115 and -1116, C.R.S.
 (2025).[4]
 
 
          ¶12
 During a discovery hearing, plaintiffs asserted that Hertz
 was their insurer. Hertz disagreed. In the briefing that
 followed, Hertz explained that plaintiffs' insurer was
 Hertz's own insurer, Chubb, and that the Chubb Policy had
 provided plaintiffs UM/UIM coverage as part of the
 supplemental insurance purchased by Rakhimov. Plaintiffs,
 however, insisted that Hertz qualified as a statutory insurer
 
 9
 
 or as a common-law de facto insurer because it had engaged in
 the business of insurance by providing supplemental insurance
 coverage as part of its rental agreement with Rakhimov.
 
 
          ¶13
 The district court held, as a matter of law, that Hertz was
 neither a statutory insurer under title 10 nor a common-law
 de facto insurer under our decision in Cary. In
 terms of title 10, the court agreed with Hertz that
 legislative amendments had abrogated the holding in
 Passamano v. Travelers Indemnity Co., 882 P.2d 1312
 (Colo. 1994), a case on which plaintiffs relied. The court
 explained that, through these amendments, the legislature had
 clearly distinguished between car rental companies and
 insurers. And because Hertz was not in the business of making
 contracts of insurance, the court ruled that Hertz did not
 qualify as a title 10 insurer.
 
 
          ¶14
 Separate and apart from title 10, the court considered the
 common law. Specifically, the court considered whether Hertz
 qualified as a common-law de facto insurer under
 Cary given (1) Hertz's involvement in the early
 stages of the assessment of plaintiffs' claims and (2)
 Hertz's significant financial stake in the resolution of
 those claims. The court recognized that Hertz had a
 significant financial interest in the resolution of
 plaintiffs' claims based on a risk-allocation agreement
 (also known as a "fronting agreement") it had
 executed with Chubb
 
 10
 
 related to the UM/UIM coverage in the supplemental
 insurance.[5] But the court nevertheless ruled against
 plaintiffs because it concluded that whatever control Hertz
 may have exerted during the initial investigation of
 plaintiffs' claims did not amount to primary
 responsibility for processing those claims. The court
 therefore concluded that Hertz could not be deemed a de facto
 insurer under Cary. Accordingly, the court dismissed
 all of the claims brought against Hertz.
 
 
          ¶15
 Plaintiffs then moved to amend their complaint to add Chubb
 and ESIS as defendants and to assert a new deceptive trade
 practices claim against Hertz. But the court denied the
 motion and entered a final judgment against
 plaintiffs.[6]
 
 
          ¶16
 Plaintiffs appealed the dismissal order, and a division of
 the court of appeals reversed. Babayev v. Hertz
 Corp., 2024 COA 15, ¶ 1, 548 P.3d 1180, 1181. The
 division determined both that Hertz was a statutory insurer
 under title 10 and that there were disputed issues of
 material fact as to whether Hertz regularly
 
 11
 
 performed the functions of an insurer and should thus be
 deemed a common-law de facto insurer under Cary. Id.
 at ¶¶ 35, 47, 548 P.3d at 1186-87.
 
 
          ¶17
 As it relates to title 10, the division determined that
 nothing in the statutory definitions of
 "insurance," "insurer," and "motor
 vehicle rental company" precluded a car rental company
 like Hertz from being deemed an insurer. Id. at
 ¶¶ 14-18, 548 P.3d at 1183. Because Hertz had
 offered Rakhimov and his passengers supplemental insurance
 encompassing UM/UIM coverage, the division concluded that
 Hertz was plaintiffs' statutory insurer. Id. at
 ¶ 35, 548 P.3d at 1186. In doing so, the division
 disagreed with the district court's view that
 Passamano had been abrogated in relevant part by our
 legislature. Id. at ¶ 19, 548 P.3d at 1183-84.
 Although the division acknowledged that, in the aftermath of
 Passamano, our legislature had exempted car rental
 insurance policies from the rules governing automobile
 insurance in title 10, including the requirement to offer
 UM/UIM coverage, the division discerned that the legislature
 had not exempted car rental companies altogether from
 qualifying as insurers. Id. at ¶ 24, 548 P.3d
 at 1184.
 
 
          ¶18
 Then, turning to our decision in Cary, the division
 homed in on Hertz's significant financial incentive in
 the resolution of plaintiffs' claims and Hertz's
 involvement in ESIS's early handling of those claims. The
 division observed that there was evidence that Hertz had
 performed some of the functions of an insurer,
 
 12
 
 which the division took to mean that a genuine dispute of
 material fact existed as to whether Hertz may be deemed a de
 facto insurer under the common law. Id. at ¶
 46, 548 P.3d at 1187. Accordingly, the division held that the
 district court had erred by resolving the issue on a motion
 filed pursuant to C.R.C.P. 56(h) ("Determination of a
 Question of Law"). Id. at ¶ 47, 548 P.3d
 at 1187. Hertz sought our review, and we granted its
 petition.
 
 
          II.
 Analysis
 
 
          ¶19
 The issue before us entails two distinct inquiries: (1)
 whether Hertz qualifies as a statutory insurer; and (2)
 whether Hertz qualifies as a common-law de facto insurer
 under Cary. But we mustn't get over our skis. We
 must first identify the applicable standard of review. Only
 after doing so may we get down to brass tacks.
 
 
          ¶20
 With the applicable standard of review as our lodestar, we
 consider whether the legislature intended to permit the
 treatment of car rental companies offering supplemental
 insurance as statutory insurers under title 10. We conclude
 that it did not. We next examine whether Cary's
 extension of the common-law duty of good faith and fair
 dealing beyond insurers—to a narrow class of
 third-party administrators—has enough elasticity to
 encompass Hertz. We conclude that it does not. In
 Cary, we penned a modest holding, confined to
 third-party administrators that not only possess a
 significant financial stake in the resolution
 
 13
 
 of claims but also have primary responsibility over claims
 handling on behalf of the ultimate insurer. It remains so
 cabined after today.
 
 
          A.
 Standard of Review
 
 
          ¶21
 First, whether Hertz qualifies as an insurer under title 10
 is an issue implicating statutory interpretation, which we
 review de novo. Shelter Mut. Ins. Co. v. Mid-Century Ins.
 Co., 246 P.3d 651, 660 (Colo. 2011). Our initial step in
 construing a statute is to ascertain and give effect to the
 intent of the General Assembly. See Apodaca v. Allstate
 Ins. Co., 255 P.3d 1099, 1102 (Colo. 2011). We decipher
 our legislature's intent by affording a statute's
 words and phrases their plain and ordinary meaning.
 Robbins v. People, 107 P.3d 384, 387 (Colo. 2005).
 To do so, we read such words and phrases in context and in
 accordance with the rules of grammar. Doubleday v.
 People, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. We are
 required to consider "the statutory scheme as a
 whole" and "'to give consistent, harmonious,
 and sensible effect to all its parts.'"
 Archuleta v. Roane, 2024 CO 74, ¶ 9, 560 P.3d
 399, 402 (quoting Dep't of Nat. Res. v. 5 Star
 Feedlot, Inc., 2021 CO 27, ¶ 20, 486 P.3d 250,
 256).
 
 
          ¶22
 Second, we likewise review de novo the district court's
 determination, pursuant to C.R.C.P. 56(h), that Hertz may be
 deemed plaintiffs' common-law de facto insurer. Great
 N. Props., LLLP v. Extraction Oil &Gas, Inc., 2024
 CO 28, ¶ 20, 547 P.3d 1110, 1116. A court may determine
 a question of law under C.R.C.P. 56(h)
 
 14
 
 if there is "no genuine issue of any material fact"
 necessary for its resolution. Coffman v. Williamson,
 2015 CO 35, ¶ 12, 348 P.3d 929, 934 (quoting C.R.C.P.
 56(h)). In the context of a C.R.C.P. 56(h) motion, the
 nonmoving party is entitled to "all favorable inferences
 from the undisputed facts," and "all doubts as to
 the existence of a triable issue of fact must be resolved
 against the moving party." Id.
 
 
          B.
 Hertz Is Not a Statutory Insurer Under Title 10
 
 
          ¶23
 The division set out on firm footing, starting where it
 should: with the plain meaning of the statutory definitions
 of "insurance" and "insurer." Section
 10-1-102(12), C.R.S. (2025), defines "[i]nsurance"
 as a "contract whereby one . . . undertakes to indemnify
 another . . . upon determinable risk contingencies." And
 section 10-1-102(13) defines an "[i]nsurer" as
 "every person engaged as principal, indemnitor, surety,
 or contractor in the business of making contracts of
 insurance." Having erected its decision on this sturdy
 foundation, however, the division stumbled on the very next
 step.
 
 
          ¶24
 Without giving the framework of title 10 much scrutiny, the
 division concluded that Hertz was a statutory insurer. It
 reasoned that, since "[t]he rental agreement between
 Hertz and Rakhimov indemnified Rakhimov and his passengers
 for damage caused by uninsured motorists," Hertz had
 "engaged as a contractor, if not an indemnitor, in the
 business of making an insurance contract."
 Babayev, ¶ 18, 548 P.3d at 1183.
 
 15
 
          ¶25
 The division used Passamano as the scaffolding for
 its determination. Id. at ¶¶ 20-24, 548
 P.3d at 1184. But Passamano cannot bear the weight
 the division asked it to support. The plaintiff in
 Passamano, like plaintiffs here, entered into an
 agreement with a car rental company. 882 P.2d at 1316. We
 held that, as a result of offering Passamano "various
 insurance coverages for specified prices," the car
 rental company qualified as an insurer "for purposes of
 section 10-4-609(1)[, C.R.S. (1994)]," a statutory
 provision compelling automobile insurers to offer UM/UIM
 coverage. Passamano, 882 P.2d at 1317. We therefore
 declared that all car rental companies offering to sell their
 customers the option of purchasing insurance were deemed to
 be insurers and were required to offer UM/UIM coverage.
 Id. at 1323.
 
 
          ¶26
 Significantly, however, our General Assembly responded to
 Passamano while the ink was still wet. In the very
 next legislative session, it began abrogating
 Passamano, leaving it moribund as relevant here; and
 in a session a few years later, it all but interred that
 decision—spade, soil, and all. Ch. 88, sec. 3, §
 10-2-105(1)(g)(I)-(IV), 1998 Colo. Sess. Laws 233,
 234[7];
 see also Ch. 88, sec. 4, § 10-3-903(2)(j), 1998
 Colo. Sess. Laws 233, 234; § 10-3-105(2), C.R.S. (2025).
 
 16
 
          ¶27
 Specifically, in the wake of Passamano, the
 legislature made significant amendments to title 10. For
 starters, it inserted paragraph (b) in section 10-4-609(1),
 the provision we applied in Passamano. Ch. 51, sec.
 4, § 10-4-609(1)(b), Colo. Sess. Laws 142, 143. The
 added paragraph provides that "[t]his subsection (1)
 shall not apply to motor vehicle rental agreements or motor
 vehicle rental companies." § 10-4-609(1)(b), C.R.S.
 (2025).
 
 
          ¶28
 Relatedly, the legislature distinguished between insurers and
 car rental companies. It defined the former as "every
 person engaged as principal, indemnitor, surety, or
 contractor in the business of making contracts of
 insurance," and the latter as "an entity that is in
 the business of renting, pursuant to motor vehicle rental
 agreements, motor vehicles." § 10-1-102(13), (15).
 In so doing, the legislature separated insurers and car
 rental companies as cleanly as if it had drawn the line with
 a razor.
 
 
          ¶29
 Elsewhere the legislature expressly declared that car rental
 agreements of the kind at issue in Passamano (the
 same kind at issue here) are not automobile insurance
 policies. Section 10-4-601(10), C.R.S. (2025), defines
 "[p]olicy" as "an automobile insurance policy
 providing coverage for all or any of the following
 coverages: . . . bodily injury liability, property damage
 liability . . . and uninsured motorist
 coverage." (Emphases added.) But, spurred by
 Passamano, the legislature added paragraph (a) to
 that subsection, explicitly exempting any agreement in
 
 17
 
 which the vehicle insured is "rented to others pursuant
 to the terms of a motor vehicle rental agreement."
 § 10-4-601(10)(a).
 
 
          ¶30
 Similarly, the legislature carved out an exception to the
 definition of "transacting insurance business" by
 proclaiming that "[t]he sale of authorized insurance by
 agents of a motor vehicle rental company" does not
 qualify as "transacting insurance business." §
 10-3-903(1), (2)(j), C.R.S. (2025).
 
 
          ¶31
 Lastly, the legislature addressed the statutory definition of
 an "[i]nsurance producer." § 10-2-103(6),
 C.R.S. (2025). A person qualifies as an insurance producer
 when the person "solicits, negotiates, effects,
 procures, delivers, renews, continues, or binds"
 policies of insurance. § 10-2-103(6)(a)(I). But
 here, too, the legislature made a change by including a
 specific exception for "[o]fficers or employees of a
 motor vehicle rental company" who offer insurance
 coverage. § 10-2-105(2)(g).
 
 
          ¶32
 Thus, prompted by our holding in Passamano, the
 legislature enacted multiple provisions to establish that (1)
 car rental companies are not insurers, (2) a car rental
 agreement offering insurance is not an automobile insurance
 policy, (3) the sale of insurance in a car rental agreement
 does not qualify as transacting insurance business, and (4)
 agents of car rental companies offering insurance through car
 rental agreements are not insurance producers. These changes,
 in addition to consigning the germane portions of
 Passamano to their final resting
 
 18
 
 place, reflect a clear intent by the legislature to
 differentiate car rental companies from insurers and rental
 agreements from insurance policies.
 
 
          ¶33
 The supplemental insurance sold here, therefore, was not an
 automobile insurance policy under title 10. See
 § 10-4-608(1)(c), C.R.S. (2025) (exempting any policy
 "arising out of a motor vehicle rental agreement"
 from all of title 10, article 4, part 6). And if the
 agreement for supplemental insurance did not constitute an
 automobile insurance policy, how can Hertz be deemed a
 contractor or indemnitor "in the business of making
 contracts of insurance" under section 10-1-102(13), as
 the division concluded? It can't.
 
 
          ¶34
 In arriving on the other side of the analytical divide, the
 division downplayed our legislature's swift response to
 Passamano and tried to explain each relevant
 statutory amendment away. Babayev, ¶¶ 24,
 25-33, 548 P.3d at 1184-85. But the division improperly
 parsed those amendments and analyzed each in isolation
 without regard to title 10's overall design. See id.
 at ¶¶ 28, 30, 33, 548 P.3d at 1185. This was a
 misstep. Courts must take a panoramic view of a statutory
 scheme and give consistent, harmonious, and sensible effect
 to all its parts. Archuleta, ¶ 9, 560 P.3d at
 402. Giving the integrated statutory framework a holistic
 reading, as we must, it becomes evident that a car rental
 company that offers its customers supplemental insurance does
 not fit within the definition of a title 10 insurer.
 See § 10-1-102(13).
 
 19
 
          ¶35
 Interestingly, the division acknowledged that "this
 delineation of what is and is not 'transacting insurance
 business' does not apply to rental car insurance,
 presumably because motor vehicle rental companies are not
 insurance companies that must procure a certificate of
 authority to do business." Babayev, ¶ 33,
 548 P.3d at 1185. But, surprisingly, the division
 nevertheless determined that Hertz was a statutory insurer.
 The statutory scheme offers no hint that the legislature
 meant to steer in opposite directions at once. And to the
 extent the division attempted to label Hertz an
 "indemnitor" for agreeing to secure supplemental
 insurance for its clients, it pushed past the title 10
 shoreline into waters the legislature never meant to
 navigate.
 
 
          ¶36
 In sum, by leaning on a case whose supporting beam has been
 shaved down in the very place this dispute turns, the
 division arrived at the wrong destination. Using a wide-lens
 perspective of title 10, as amended post-Passamano,
 we conclude that Hertz does not qualify as a statutory
 insurer. Rather than being in the business of making
 insurance contracts, Hertz is "in the business of
 renting . . . motor vehicles." § 10-1-102(15);
 see also Passamano, 882 P.2d at 1329 (Vollack, J.,
 dissenting) (noting that the car rental company involved was
 "engaged in the business of renting motor vehicles, and
 not in the business of insurance sales").
 
 20
 
          ¶37
 Having held that Hertz is not a statutory insurer, the
 remaining question is whether it nonetheless bears the
 hallmarks of one under the common law as interpreted by
 Cary—in short, whether it should wear the
 mantle of a de facto insurer. We turn to that issue now.
 
 
          C.
 Hertz Does Not Qualify as a De Facto Insurer Under the Common
 Law
 
 
          1.
 Applicable Common-Law Principles
 
 
          ¶38
 Although Colorado law reads into every contract a duty of
 good faith and fair dealing, a breach of this duty is not
 generally actionable in tort. Cary, 68 P.3d at 466.
 Insurance contracts, however, are cut from a different cloth.
 Id. Given the "special nature of the insurance
 contract" relative to other kinds of contracts, and
 given further "the 'special nature' of the
 relationship that exists between an insured and his
 insurer," a breach of the duty of good faith and fair
 dealing in an insurance contract "gives rise to a
 separate cause of action sounding in tort." Id.
 at 466-67 (quoting Travelers Ins. Co. v. Savio, 706
 P.2d 1258, 1272 (Colo. 1985)); see also Goodson v. Am.
 Standard Ins. Co. of Wis., 89 P.3d 409, 414 (Colo. 2004)
 (examining the distinct motivations and disparate positions
 of insurers and insureds).
 
 
          ¶39
 To succeed on a tort cause of action for a bad-faith breach
 of an insurance contract, a plaintiff must prove that the
 defendant owed a duty of good faith and fair dealing in
 investigating and processing the plaintiff's claim.
 Id. at 465. An
 
 21
 
 insurer breaches its duty of good faith and fair dealing when
 it conducts an unreasonable investigation, unreasonably
 refuses to pay benefits, or offers an unreasonable
 explanation for denying a claim—while knowingly or
 recklessly disregarding the unreasonableness of its conduct
 in each instance. See Riccatone v. Colo. Choice Health
 Plans, 2013 COA 133, ¶ 41, 315 P.3d 203, 210.
 
 
          ¶40
 Because an insurer's duty of good faith and fair dealing
 is nondelegable, an insurer "cannot escape"
 liability simply by outsourcing claims handling or other
 tasks. Cary, 68 P.3d at 466. Thus, when the duty of
 good faith and fair dealing is breached, it is generally the
 insurer—rather than an "agent[] involved in claims
 processing"—that is on the hook for any tort
 liability. Riccatone, ¶ 14, 315 P.3d at 206
 (quoting Cary, 68 P.3d at 466).
 
 
          ¶41
 Relatedly, the general rule is that, because the insurer has
 a special relationship with the insured by virtue of the
 insurance contract, the insurer owes a duty of good faith and
 fair dealing to the insured. Cary, 68 P.3d at 466.
 Typically, then, the insured may bring a claim for breach of
 the duty of good faith and fair dealing only against the
 insurer.
 
 
          ¶42
 Of course, a general rule, by its very nature, leaves room at
 the margins for exceptions. Enter Cary. We held
 there that when "a third-party administrator [(1)]
 performs many of the tasks of an insurance company and [(2)]
 bears some of the financial risk of loss for the claim,"
 there is "a special relationship" between
 
 22
 
 the administrator and the insured "sufficient for
 imposition of a duty of good faith and tort liability for its
 breach—even when there is no contractual privity
 between the defendant and the [insured]." Id.
 at 466, 469. This holding forms the battleground on which the
 parties' common-law disagreement is fought.
 
 
          2.
 Cary's Judicially Crafted Tort Duty Is Narrowly
 Confined and Does Not Extend to Hertz Here
 
 
          ¶43
 Plaintiffs contend that Hertz meets Cary's
 criteria and should therefore be liable under the common law
 for breach of the duty of good faith and fair dealing. In
 other words, according to plaintiffs, even if Hertz
 doesn't qualify as a statutory insurer under title 10, it
 should nevertheless be treated as a de facto insurer under
 the common law. Hertz counters that plaintiffs'
 comparison of this case to Cary is an
 apples-to-oranges one because, unlike the third-party
 administrator in Cary, Hertz was neither
 expressly retained by the insurer to act on its
 behalf in administering claims nor regularly operating in the
 business of insurance. Consequently, Hertz urges us to
 decline plaintiffs' invitation to extend our holding in
 Cary to the circumstances of this case. To get to
 the bottom of the question, we must unpack Cary.
 
 
          ¶44
 In Cary, the City of Arvada offered its employees
 access to a self-funded health insurance program overseen by
 the Arvada Medical and Disability Program Trust Fund (the
 "Trust"). Id. at 464. Because the Trust
 had limited resources and little claims-handling experience,
 it retained third-party
 
 23
 
 administrators, United of Omaha Life Insurance Company and
 Mutual of Omaha of Colorado (collectively,
 "United"), to execute "virtually all of the
 functions normally performed by an insurance company in
 processing claims and determining whether to deliver
 insurance benefits." Id. at 464, 468, 464 n.3.
 Specifically, United assumed responsibility for the following
 aspects of the claims-handling process:
 
 
 • providing claims-handling facilities, personnel,
 procedures, files, and systems;
 
 
 • verifying claimant eligibility;
 
 
 • receiving all claim forms and related materials from
 plan members;
 
 
 • processing submitted claims and issuing
 explanation-of-benefits letters to claimants upon taking
 action on a claim;
 
 
 • preparing claim payments;
 
 
 • offering actuarial and underwriting services to
 recommend benefit modifications;
 
 
 • printing and covering the cost of all plan claim forms
 and benefit checks;
 
 
 • developing and printing plan-benefit booklets and
 identification cards;
 
 
 • evaluating the health histories of late applicants and
 determining whether they should receive plan coverage; and
 
 
 • periodically auditing the claims-processing system to
 assess the quality of claim administration, including
 establishing an appellate procedure for coverage denials.
 
 
 Id. at 464.
 
 24
 
          ¶45
 Beyond exercising "primary control" over the
 administration of claims and the determination of benefits,
 United was also a party to a reinsurance agreement under
 which it insured claim payments between $75,000 and
 $1,000,000, creating "a significant financial incentive
 to delay payment of benefits or coerce [the insured] into a
 diminished settlement." Id. at 463-64, 468.
 
 
          ¶46
 Given that United had both primary responsibility
 for claims handling and a significant financial stake in the
 resolution of claims, we concluded that it effectively stood
 in the shoes of an insurer. Id. at 469. We added
 that United shared a "special relationship" with
 the insureds that warranted treatment as a de facto insurer
 under the common law. Id. at 468. In essence, we
 applied the familiar "duck test": United walked,
 swam, and quacked like an insurer, so we deemed it one.
 
 
          ¶47
 Thus, Cary ushered in a judicially crafted tort
 limited to third-party administrators with both primary
 responsibility over the claims-handling process and a
 significant financial incentive in the resolution of claims.
 See id. at 468-69. For twenty-three years,
 Cary has stood where we first placed it; we have not
 revisited it—let alone pushed its boundaries.
 
 
          ¶48
 A division of the court of appeals did apply Cary,
 though, a decade into that case's life. See
 Riccatone, ¶ 12, 315 P.3d at 206. Much like
 Cary, Riccatone addressed the conduct of
 third-party administrators performing claims-adjustment
 duties for
 
 25
 
 a self-funded health plan. Id. at ¶¶ 2,
 12-22, 315 P.3d at 205-07. The division ultimately concluded
 that, in the absence of the reinsurance agreement present in
 Cary or any comparable "financial
 incentive" tied to the ultimate risk of loss, the
 third-party administrators could not be held liable for
 breach of the duty of good faith and fair dealing under the
 common law. Id. at ¶¶ 18, 22, 315 P.3d at
 207. Accordingly, the division determined that the
 third-party administrators were not liable to the insured.
 Id. at ¶ 22, 315 P.3d at 207.
 
 
          ¶49
 Although Riccatone crossed the finish line in the
 right place, its stride along the way deserves attention. The
 Riccatone division distilled Cary's
 holding into a two-part inquiry: Whether a "third
 part[y]" (1) had performed the functions of an insurer
 and (2) possessed a significant financial incentive to limit
 an insured's claims. Id. at ¶ 17, 315 P.3d
 at 207. We refine Riccatone's reading of the
 Cary test now by emphasizing that the "third
 parties" to whom common-law bad-faith liability may
 extend are limited to administrators whose primary
 business is claims handling and who have a significant
 financial stake in the resolution of claims. Cary,
 68 P.3d at 468-69. That's what Cary teaches.
 Id. To the extent the division in this case relied
 on Riccatone to extend Cary's scope to
 any third party satisfying the two-part criteria
 just described, it erred.
 
 
          ¶50
 Cary sought to make certain that administrators
 whose primary business is claims handling (i.e.,
 administrators retained primarily to perform
 insurer-like
 
 26
 
 functions) and who share the insurer's financial
 incentives in the resolution of claims are held to the
 standards applicable to insurers. In Cary, treating
 the third-party administrator as a de facto insurer was
 appropriate because United was primarily responsible for
 claims handling, regularly operated within the
 claims-management industry, and had a significant financial
 stake in the resolution of claims. Id.
 
 
          ¶51
 Unlike United, Hertz is not a third-party administrator; that
 role belongs solely to ESIS. Nor does Hertz carry primary
 responsibility for claims handling; that duty rests squarely
 with ESIS.
 
 
          ¶52
 Moreover, the relationship between Hertz and plaintiffs bears
 minimal resemblance to the "special relationship"
 between United and the insureds in Cary. See
 id. at 468. In this case, an actual
 insurer—Chubb—stands at the center of the
 insurer-insured relationship and is expressly designated as
 the entity responsible for making payments on plaintiffs'
 claims. The Chubb Policy spells out the parties' roles in
 black-and-white: Chubb is the insurer; Hertz is the named
 insured; and purchasers of supplemental insurance are
 additional insureds. Further, the record confirms that Hertz
 paid premiums to Chubb; that plaintiffs were told early on in
 this litigation that Chubb was the entity ultimately
 responsible for coverage decisions and payments; and that
 ESIS—a Chubb subsidiary expressly retained to process
 claims—investigated, adjusted, and paid claims on
 Chubb's behalf. In
 
 27
 
 both form and function, Chubb acted as the insurer, ESIS
 acted as the third-party administrator, Hertz acted as the
 insured, and plaintiffs acted as additional insureds.
 
 
          ¶53
 Thus, while United determined eligibility, processed and paid
 claims, issued benefit decisions, and handled appeals, Hertz
 did none of this. It did not underwrite the risk, adjust
 claims, or issue payments. Those primary insurer
 functions were performed by ESIS, which investigated the
 claims, collected and reviewed records, coordinated
 examinations, communicated with plaintiffs' counsel, and
 paid benefits under the Chubb Policy. These circumstances
 reflect Hertz's business reality: Hertz rents cars; it
 doesn't insure them.
 
 
          ¶54
 True, Hertz participated in the early investigation and
 adjustment of plaintiffs' claims and offered input on
 potential settlement. But those actions pale in comparison to
 United's and come up woefully short of what Cary
 requires for de facto insurer status.
 
 
          ¶55
 We caution that Cary's cornerstone is not an
 open invitation for courts to impose bad-faith tort liability
 on every entity that happens to touch an insurance claim. No,
 Cary offered a targeted solution to a narrow
 problem—one that arises only when control, expertise,
 and financial incentives converge in a third-party
 administrator whose primary business is claims
 handling and who effectively substitutes
 
 28
 
 for the insurer. And Cary's limited
 reach over the past two-plus decades confirms this
 reading.[8]
 
 
          ¶56
 We are not persuaded otherwise by plaintiffs' argument
 that Hertz's offer of supplemental insurance during a
 car-rental transaction transformed it into a de facto
 insurer. At most, Hertz agreed through the supplemental
 insurance sold in its rental agreement to secure
 coverage for purchasers, a commonplace commercial
 arrangement. See, e.g., Md. Cas. Co. v. Buckeye
 Gas Prods. Co., 797 P.2d 11, 12 (Colo. 1990) (examining
 a supplier-distributor agreement requiring the supplier to
 name the distributor as an additional insured); Weitz Co.
 v. Mid-Century Ins. Co., 181 P.3d 309, 310 (Colo.App.
 2007) (interpreting an additional-insured endorsement based
 on a subcontractor's promise to insure the general
 contractor). While such
 
 29
 
 agreements routinely confer additional-insured status to
 others (such as Hertz's customers) under a named
 insured's policy (such as Hertz's Chubb Policy), they
 do not alter the fundamental roles of the insurer, the named
 insured, and the additional insureds.
 
 
          ¶57
 Treating a mere agreement by a named insured to secure
 supplemental insurance coverage for additional insureds as
 though it were the actual issuance of an insurance policy
 would collapse the distinction between the insurer and the
 named insured. More importantly, doing so would have a
 chilling effect that could extend beyond the car rental
 industry. If a car rental company offering incidental access
 to insurance coverage is an "insurer" potentially
 subject to liability—notwithstanding the General
 Assembly's painstaking efforts to make clear that such a
 company is not an "insurer"—the same would
 seemingly be true of any Colorado business that offers access
 to third-party insurance incidental to the services or
 products it sells.
 
 
          ¶58
 Imposing de facto insurer status on Hertz is also
 particularly unwarranted here given the legislature's
 deliberate decision to prevent car rental companies from
 being treated as insurers under title 10. Our jurisprudence
 makes clear that it is "not this court's place to
 substitute the judiciary's policy judgments for those of
 the General Assembly." Bermel v. BlueRadios,
 Inc., 2019 CO 31, ¶ 37, 440 P.3d 1150, 1158.
 Indeed, we do not act by judicial fiat. Our mission instead
 is to honor
 
 30
 
 the legislature's considered judgment. Because the
 legislature has expressly carved out an exception from title
 10 for car rental companies that merely facilitate insurance,
 we must uphold that choice rather than invent liability
 through the common law. See, e.g., Martinez v.
 Lewis, 969 P.2d 213, 219 (Colo. 1998)
 (declining to impose a duty of care onto a physician
 performing an independent medical evaluation when doing so
 would countermand the General Assembly's decision
 "to limit an IME practitioner's liability for his or
 her findings"). To take plaintiffs up on their request
 to stretch Cary in a way that treats as insurers any
 rental companies offering supplemental insurance would be to
 improperly sneak through the "back door" what the
 legislature has barred at the "front door." See
 Laird v. Nelms, 406 U.S. 797, 802 (1972).[9]
 
 
          ¶59
 Before we draw the curtain on this opinion, one final point
 is worth making. Rejecting plaintiffs' request to deem
 Hertz a de facto insurer does not leave them without
 alternate recourse. Unlike the situation in Cary,
 where the "unavailability or inadequacy" of
 recovery was a reality that seemingly motivated this court to
 recognize de facto insurer status, Cary, 68 P.3d at
 472 (Coats, J., dissenting), plaintiffs here have avenues for
 relief against Chubb and ESIS under both
 
 31
 
 statutory and common-law theories. Indeed, plaintiffs are
 currently pursuing statutory and common-law claims against
 Chubb and ESIS in federal court. Additionally, plaintiffs
 have another path open to them with respect to Hertz, as
 evidenced by the claim they have brought in federal court
 pursuant to the Colorado Consumer Protection Act, alleging
 that Hertz engaged in deceptive trade practices with respect
 to the marketing and sale of supplemental insurance benefits.
 
 
          III.
 Conclusion
 
 
          ¶60
 For these reasons, we conclude that, under Colorado law,
 Hertz is neither plaintiffs' statutory insurer nor
 plaintiffs' common-law de facto insurer. Accordingly, we
 reverse the division's judgment The district court
 correctly dismissed plaintiffs' claims against Hertz as a
 matter of law We therefore remand the case to the division
 with instructions to return it to the district court for
 reinstatement of the dismissal order.
 
 
          
 JUSTICE HOOD, joined by JUSTICE GABRIEL and JUSTICE BLANCO,
 concurred in part and dissented in part.
 
 32
 
          
 JUSTICE HOOD, joined by JUSTICE GABRIEL and JUSTICE BLANCO,
 concurring in part and dissenting in part.
 
 
          ¶61
 I agree with the majority that the General Assembly
 didn't intend for rental car companies like Hertz to be
 treated as statutory insurers. Maj. op. ¶ 36.
 
 
          ¶62
 But when, as here, a rental car company (1) generates revenue
 from a third-party insurance policy it offers to its
 customers, (2) assists in adjusting claims under that policy,
 and (3) assumes complete financial risk for those claims, the
 rental car company potentially becomes a de facto insurer
 under the common law. This is because the rental car
 company's control over benefits and its incentive to
 minimize claims exposure create a special relationship and
 thus a duty of good faith and fair dealing with the
 policyholder. Cary v. United of Omaha Life Ins. Co.,
 68 P.3d 462, 468 (Colo. 2003). Under Cary, a de
 facto insurer can't escape liability for breaching that
 duty by pointing to the formalities of contractual privity
 that typically define a bad-faith claim.
 
 
          ¶63
 Because statutory and common-law insurance claims are
 distinct under Colorado law, Vaccaro v. Am. Fam. Ins.
 Grp., 2012 COA 9M, ¶¶ 20-21, 275 P.3d 750,
 756, and because I believe that resolution of the remaining
 factual disputes may reveal that the plaintiffs'
 common-law claims fall within the breadth of Cary, I
 respectfully dissent from Part II.C of the majority opinion.
 
 33
 
          ¶64
 At its core, Cary tells us when a plaintiff should
 be allowed to bring an insurance bad-faith claim despite
 lacking privity of contract with the defendant. Privity of
 contract is the direct legal relationship created between two
 parties to a valid contract. Privity, Black's
 Law Dictionary (12th ed. 2024). It's a required element
 of most bad-faith claims because the "special
 relationship" between the policyholder and the insurer
 creates a nondelegable duty of good faith and fair dealing
 that is implied in an insurance contract. Cary, 68
 P.3d at 466. But the assumption that the special relationship
 only exists between parties in privity of contract is
 predicated on the notion that insurance involves a simple,
 two-party relationship between the insurer and its
 policyholder. Under more complex insurance arrangements,
 those assumptions break down. Cary demonstrated that
 in multi-party insurance structures, the entity asked to
 evaluate the policyholder's claim in good faith retains a
 special relationship with the policyholder, even without
 privity of contract.
 
 
          ¶65
 The fronting policy between Hertz and Chubb is an example of
 a complex insurance arrangement that strains the assumptions
 underpinning the privity requirement. Under a fronting
 policy, a noninsurer enterprise and a licensed insurer agree
 to policy limits that match the deductible. 1 Robert H.
 Jerry, II, New Appleman on Insurance Law Library
 Edition, § 1.09[4], LEXIS (database updated 2025).
 In practice, this means that while an insurer like Chubb may
 compensate
 
 34
 
 the policyholder up to the limits of its policy, Hertz is
 obligated to reimburse Chubb through its deductible, which
 will cover the entire amount paid by Chubb. Babayev v.
 Hertz Corp., 2024 COA 15, ¶ 6 n.2, 548 P.3d 1180,
 1182 n.2; see also Esteban Carranza-Kopper,
 Fronting Arrangements: Industry Practices and Regulatory
 Concerns, 17 Conn. Ins. L.J. 227, 229 (2010). As a
 result, on the facts before us, Hertz functionally retained
 liability for all claims and transferred no risk to Chubb.
 
 
          ¶66
 Fronting effectively allows large corporations, which are not
 licensed insurers, to operate their own self-funded insurance
 programs when state insurance regulation would make it
 impractical to officially do so. See Reliance Ins. Co. v.
 Shriver, Inc., 224 F.3d 641, 643 (7th Cir. 2000). Put
 another way, "[i]n a fronting policy, the insured
 essentially rents an insurance company's licensing and
 filing capabilities, but the insurance company does not
 actually pay any claims." Dorsey v. Fed. Ins.
 Co., 798 N.E.2d 47, 51 (Ohio Ct. App. 2003). That's
 why courts have granted "a direct right of action"
 to "the person[] to whom [the fronting policy is
 payable]" against the enterprise-policyholder to enforce
 payment, even when that would otherwise flout privity
 requirements. O'Hare v. Pursell, 329 S.W.2d 614,
 620 (Mo. 1959).
 
 
          ¶67
 While our precedent hasn't addressed fronting policies
 directly, the privityrequirement exception established in
 Cary demonstrates that Colorado law is compatible
 with a cause of action based on fronting. 68 P.3d at 468.
 Cary provided
 
 35
 
 a two-prong standard for dispensing with privity, justified
 by a pragmatic understanding of the multi-party relationships
 that arise in complex insurance arrangements. Id.
 Cary held that a common-law insurance bad-faith
 plaintiff is exempt from proving privity if the would-be
 defendant had (1) "primary control over benefit
 determinations" and (2) "significant financial
 incentive to delay payment of benefits or [to] coerce [the
 policyholder] into a diminished settlement."
 Id. at 467-68 (first citing Travelers Ins. Co.
 v. Savio, 706 P.2d 1258, 1272 (Colo. 1985); and then
 citing Scott Wetzel Servs., Inc. v. Johnson, 821
 P.2d 804, 808 (Colo. 1991), to trace the conditions under
 which Colorado has created exceptions to privity
 requirements). When both requirements are met, a court may
 consider the control and financial incentives demonstrated by
 all parties to the insurance arrangement without putting
 dispositive weight on explicit contractual obligations or
 formal titles.
 
 
          ¶68
 In contrast, the majority narrowly reads Cary as
 creating a formalistic rule that regulates the conduct of
 third-party claims administrators when they provide
 operational support to self-funded insurance programs. Maj.
 op. ¶¶ 47-50. Under that reading, the analysis is
 simple—Hertz isn't a third-party claims
 administrator, so it can't be a de facto insurer under
 Cary.
 
 
          ¶69
 But I find no language in Cary to indicate that our
 holding was "limited to third-party
 administrators." Id. at ¶ 47. Rather, the
 sentence from Cary that the
 
 36
 
 majority leans on is the only instance when we
 narrowly referred to third-party claims administrators, and
 we did so to apply the rule to the defendant in that case.
 Cary, 68 P.3d at 468-69 (concluding the analysis of
 the subsection "Special Relationship in This
 Case" by stating: "When a third-party
 administrator performs many of the tasks of an insurance
 company and bears some of the financial risk of loss for the
 claim, the administrator has a duty of good faith and fair
 dealing to the insured in the investigation and servicing of
 the insurance claim." (emphasis added)).
 
 
          ¶70
 Taking that sentence in isolation, as the majority does,
 ignores other points in the opinion when we used more general
 terms to describe the legal rule that would shape what types
 of entities could be subject to Cary liability.
 See, e.g., id. at 466 ("When the
 actions of a defendant are similar enough to those
 typically performed by an insurance company in claim
 administration and disposition, we have found the existence
 of a special relationship . . . even when there is no
 contractual privity between the defendant and the
 plaintiff." (emphasis added)). In limiting Cary
 to its facts, the majority ignores the broader principles
 upon which Cary is built. See id.
 
 
          ¶71
 And perhaps more importantly, I fear that appending a third
 requirement to Cary, as the majority does today,
 Maj. op. ¶ 49, creates a formalistic limit to which
 entities can be held responsible for unfair insurance
 practices under Cary.
 
 37
 
 Adding a label-driven third requirement to Cary
 provides a way for sophisticated actors in the insurance
 industry to administer aggressive claims-adjustment practices
 through an entity not titled "third-party claims
 administrator," and then use the absence of that
 all-important title as evidence that Cary
 doesn't apply. Rather than simply making Cary a
 "walks-like-a-duck, quacks-like-a-duck" standard,
 the majority requires a plaintiff to identify a singular
 species of duck to access Cary's rule.
 Id. at ¶ 46.
 
 
          ¶72
 For the sake of argument, let's assume that Cary
 identifies a category of entities, rather than a specific
 example, and apply that assumption to these facts. If
 Cary does create a general standard, instead of a
 factually constrained rule, could the fronting policy between
 Hertz and Chubb establish the necessary control and financial
 incentives for Hertz to be a de facto insurer? I believe so.
 
 
          ¶73
 It's undisputed that the policy formed a fronting
 relationship between Hertz and Chubb and that Hertz retained
 final financial liability for all of plaintiffs' claims
 up to one million dollars through the deductible it pays
 Chubb. Facing impending financial liability for
 plaintiffs' claim, Hertz appears to have tried to
 minimize that cost.
 
 
          ¶74
 For example:
 
 
 • A member of Hertz's legal team requested that
 plaintiffs provide Hertz with their medical records, which
 would allow "Hertz to complete its evaluation of these
 claims."
 
 38
 
 • An employee of ESIS revealed in a deposition that
 Hertz "maintain[ed] high involvement" throughout
 the claims-adjustment process and "h[e]ld the ultimate
 authority" in determining the value of claims because
 "[i]t is their money[;] . . . it's their case, in
 the end."
 
 
 • And the Risk Management Services Agreement between
 Hertz and ESIS identified Hertz as "responsible for
 certain obligations," including final settlement
 authority for larger claims.
 
 
          This
 demonstrates "primary control over benefit
 determinations" and "significant financial
 incentive to delay payment of benefits or . . . diminish[]
 settlement." Cary, 68 P.3d at
 468.[1]
 
 
          ¶75
 It's entirely possible that additional discovery might
 reveal an alternate explanation for Hertz's actions that
 demonstrates why it's outside of the reach of
 Cary. But the opportunity to allow that factual
 development to continue is why the division held that the
 trial court erred by resolving plaintiffs' common-law
 claims under C.R.C.P. 56(h). Babayev, ¶ 47, 548
 P.3d at 1178. I agree.
 
 
          ¶76
 Accordingly, I would affirm the division's opinion in
 relevant part and remand this case to the trial court to
 allow the parties to litigate the application of
 Cary, consistent with the broader view of that case
 I express here. So, I respectfully
 
 39
 
 dissent in part with respect to the majority's
 application of Cary to the plaintiffs'
 common-law claims.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issue:
 
 
 Whether, after the legislative abrogation of
 Passamano v. Travelers Indemnity Co., 882 P.2d 1312
 (Colo. 1994), a "motor vehicle rental company" may
 be considered a statutory or de facto "insurer,"
 where its rental agreement incidentally offers customers the
 option of purchasing insurance coverage provided by a
 licensed, third-party insurer under the rental company's
 own pre-existing policy with that insurer.
 
 
 [2] Hertz maintained a Risk Management
 Services Agreement with ESIS. Consistent with the Chubb
 Policy, that agreement stated that ESIS was authorized to
 provide claims-handling services for Hertz, including:
 opening and maintaining claim files; establishing claim
 reserves; investigating claims; retaining defense counsel;
 and settling claims on Hertz's behalf, subject to
 discretionary settlement limits of $25,000 per person and
 $50,000 per accident. The Risk Management Services Agreement
 further obligated Hertz to secure and maintain "any
 consent from [Chubb] that is necessary for ESIS to perform
 Claim Adjustment Services for Claims under [the Chubb
 Policy]," thereby reinforcing the tripartite
 relationship among Chubb, ESIS, and Hertz.
 
 
 [3] The original complaint also included
 claims against George Parker, a licensed attorney
 representing Hertz, and Samantha Howard, a claims adjuster
 acting on behalf of ESIS. Parker and Howard moved to dismiss
 under C.R.C.P. 12(b)(5) for failure to state a claim upon
 which relief could be granted. The district court granted
 their motion, finding that neither individual (1) was a party
 to the rental agreement or a statutory insurer or (2) owed
 plaintiffs a common-law duty of good faith and fair dealing.
 The dismissal of those claims is not before us.
 
 
 [4] Plaintiffs' bad-faith claims were
 premised on the theory that, by selling supplemental
 insurance coverage, Hertz qualified as both a statutory
 insurer and a common-law de facto insurer. However,
 plaintiffs expressly acknowledged in their complaint that
 ESIS was the third-party administrator responsible for
 processing claims, including those seeking UM/UIM
 benefits.
 
 
 [5] Under this arrangement, Chubb
 initially paid UM/UIM claims on Hertz's behalf up to the
 $1,000,000 policy limit, after which Hertz was required to
 reimburse Chubb (through a "deductible") the exact
 amount paid. Practically speaking, this structure placed the
 ultimate financial responsibility for UM/UIM claims on
 Hertz.
 
 
 [6] One month later, plaintiffs filed
 claims in federal court similar to those it sought to add
 through its motion to amend. See Complaint,
 Babayev v. Hertz Corp., No. 1:23-cv-00311-GPG-MEH
 (D. Colo. Feb. 2, 2023). The federal case is on hold pending
 the resolution of this case. Plaintiffs' Status Report,
 Babayev v. Hertz Corp., No.1:23-cv-00311-GPG-MEH (D.
 Colo. May 24, 2023).
 
 
 [7] In 2001, the legislature amended this
 statute, adding a new subsection (1) and relocating this
 portion of the statute to subsection (2). Ch. 306, sec. 5,
 § 10-2-105(2)(g)(I)-(IV), 2001 Colo. Sess. Laws 1190,
 1992-94.
 
 
 [8] It is worth noting that Cary
 placed Colorado in rare company among the states. See De
 Dios v. Indem. Ins. Co. of N. Am., 927 N.W.2d 611, 622
 (Iowa 2019) (indicating there are "relatively few
 jurisdictions that allow claims against third-party
 administrators"). The vast majority of jurisdictions to
 consider the issue have declined to extend bad-faith
 liability to other entities—including, in some
 instances, third-party administrators—lacking privity
 with the insured. Id. at 623; see also William
 Powell Co. v. Nat'l Indem. Co., 141 F.Supp.3d 773,
 782-83 (S.D. Ohio 2015) (concluding that, absent privity,
 Ohio law does not permit bad faith claims against third-party
 administrators); McLaren v. AIG Domestic Claims,
 Inc., 853 F.Supp.2d 499, 511 (E.D. Pa. 2012) (same under
 Pennsylvania law); Charleston Dry Cleaners & Laundry,
 Inc. v. Zurich Am. Ins. Co., 586 S.E.2d 586, 588 (S.C.
 2003) (holding that "no bad faith claim can be brought
 against an independent adjuster or independent adjusting
 company" due to the lack of privity). Stretching
 bad-faith liability past Cary's contours, as
 plaintiffs urge, would place Colorado in even sharper tension
 with the overwhelming majority of states and propel it into
 territory that few—if any—jurisdictions have
 chosen to chart.
 
 
 [9] Plaintiffs ask us not to consider
 Hertz's assertion that it did not owe them a duty of care
 under traditional tort principles because it did not
 raise the argument in the proceedings below. Inasmuch as
 Hertz prevails on other grounds, we do not need to reach that
 question or plaintiffs' waiver contention.
 
 
 [1] To be clear, I'm not suggesting
 that every entity carrying a fronting policy must be
 treated as a de facto insurer in all circumstances. Rather, I
 would conclude that Hertz's level of involvement and
 course of conduct during the claims administration process
 satisfied Cary's test for de facto
 insurers.
 
 
 ---------